James KUJAWSKI, as Special Administrator of the Estate of Angeline Ciesielczyk a/k/a Angela Cieler, Plaintiff-Appellant-Petitioner,

Margaret H. HECKLER, Secretary of Department of Health & Human Services, United States of America, and State of Wisconsin, Department of Health & Social Services, Plaintiffs,

v.

ARBOR VIEW HEALTH CARE CENTER, A Partnership Consisting of Edwin M. Kruchten and Elizabeth M. Kruchten, partners, and Occidental Fire & Casualty Company of North Carolina, Defendants-Respondents.

Supreme Court

*No. 84–1789. Argued April 22, 1987.—Decided June 22, 1987.*

(Also reported in 407 N.W.2d 249.)

For the plaintiff-appellant-petitioner there was a brief and oral argument by *David C. Pappas,* Madison.

For the defendants-respondents there was a brief by *Bradley D. Armstrong, Barbara J. Swan,* and *Brynelson, Herrick, Bucaida, Dorschel & Armstrong,* Madison and oral argument by *Barbara J. Swan.*

WILLIAM G. CALLOW, J.   This is a review of a published decision of the court of appeals, *Kujawski v. Arbor View Center,* 132 Wis. 2d 178, 389 N.W.2d 831 (1986), affirming a judgment of the circuit court for Dane county, Judge Mark A. Frankel, dismissing plaintiff's cause of action at the close of the plaintiff's case because of insufficiency of the evidence.

This case involves a lawsuit brought by Angela Cieler[1] against Arbor View Health Care Center (Arbor View) for personal injuries sustained when Cieler fell out of her wheelchair. The complaint alleges that on November 11, 1982, an employee of Arbor View was pushing Cieler in a wheelchair to a recreation room at the Arbor View facility. As the wheelchair ap-

---

[1]The action was originally brought by Angeline Ciesielczyk a/k/a Angela Cieler. After the commencement of the action but before trial, Cieler died, and her nephew, James Kujawski, was substituted as plaintiff.

proached a table in the recreation room, Cieler was thrust forward out of the wheelchair, striking her head on the edge of the table and landing on her right arm and leg. The complaint further alleges that, at the time of Cieler's accident, Arbor View was negligent in (1) not securely tying or strapping Cieler into the wheelchair; (2) pushing the wheelchair at a speed which was too fast under the conditions; (3) striking the table with the wheelchair as it was being pushed; and (4) stopping the wheelchair so abruptly as to cause the plaintiff to be thrown forward out of the chair. The complaint also alleges that, as a direct result of Arbor View's negligence, Cieler suffered severe and serious personal injuries.

At the close of plaintiff's direct evidence, Arbor View moved for dismissal, pursuant to sec. 805.14(3), Stats., on the ground of insufficiency of the evidence. The trial court granted Arbor View's motion to dismiss because no expert testimony was presented to establish the standard of care owed by Arbor View to Cieler.

There are two issues before us on review. First, is expert testimony needed to establish the standard of care applicable to a nursing home where the alleged negligence consisted of failing to secure an elderly patient in her wheelchair so as to prevent her from falling? Second, if expert testimony is not required, was sufficient evidence presented at trial to raise a jury question as to causation? The trial court and the court of appeals both concluded that expert testimony was necessary to prove the applicable standard of care. Because we conclude that the determination of whether to use a restraining belt, in the present case, involves a matter of routine care within a jury's common knowledge, we hold that expert testimony

was not necessary to establish the standard of care applicable to the nursing home. In addition, we conclude that the evidence presented at trial was sufficient to raise a jury question as to causation. Accordingly, we reverse the court of appeals.

As noted earlier, our review of this case follows a motion to dismiss on the ground of insufficiency of the evidence brought at the close of the plaintiff's evidence. Because the trial court determined that the evidence as presented was insufficient as a matter of law, there have been no factual findings in this case. Accordingly, our determination of the issues before us is based upon the evidence presented at trial.

Angela Cieler was admitted to Arbor View on June 1, 1977. At the time of her admittance, she was eighty-one years of age and in poor health. According to testimony introduced by James Kujawski (Kujawski), her nephew, Cieler had poor vision and poor hearing, suffered from arthritis, was overweight, and was unable to walk. Other testimony indicated that Cieler had a ventral hernia which extended from the base of her sternum to just above her pubis which puffed out from her stomach like a balloon. Throughout her stay at Arbor View, Cieler was confined to a wheelchair or to her bed.

Jean Hegerich, the administrator of Arbor View, was called as an adverse witness by Kujawski and testified to numerous "incidents" involving Cieler during the course of her stay at Arbor View. Her testimony concerning these incidents consisted of reading the following notations from Cieler's medical records. In the first instance, dated May 11, 1981, an Arbor View nurse wrote: "During transfer Angela was unable to bear her own weight and was assisted to the floor by two aides. She offers no complaint of—and

there is no apparent injury." The second instance was dated August 26, 1981, and provides: "Patient transferred with two to toilet. Trouble when transferring back into wheelchair. Patient started slipping, nurse and aide were able to get her back into chair." In the third instance, dated December 23, 1981, an Arbor View nurse wrote: "Found patient sitting on floor. States that the . . . wheelchair did not move when she moved." On March 1, 1982, the medical record noted: "Apparently attempted standing up alone. Slipped and slid under the bed. The patient states she . . . fell on buttock." Hegerich further testified that Cieler's medical records contained a notation on March 2, 1982, which provides: "Angela's behavior remains basically the same. . . . She fell out of her wheelchair recently. . . . Due to her size it is impossible for her to sit back in her wheelchair."

Hegerich also testified that Arbor View utilized a number of different restraints on residents, including a pelvic restraint, an apron, a vest restraint (Posey safety vest), a soft belt restraint, and a Posey poncho. According to Hegerich, a pelvic restraint is used to keep one more comfortable in one's chair and to keep one from falling out of a wheelchair. She also testified that an apron is used to support a person, to assist in keeping the person straight while sitting in a chair. Hegerich further testified that she had never seen a safety belt used on a wheelchair and that Arbor View did not have any wheelchairs with safety belts attached.

Vivian Seivard, head of volunteer services at Arbor View, was also called as an adverse witness by Kujawski. Seivard testified that on November 11, 1982, she wheeled Cieler, in Cieler's wheelchair, into the dining room to play bingo. As they approached the

dining room, Cieler's lap robe fell onto the floor. Seivard retrieved the robe and continued wheeling Cieler at a slow speed toward the table. Seivard further testified that, at approximately 2½ feet from the table, Cieler leaned forward with her right hand as if to pull herself up to the table "and [Cieler] started to fall and the wheelchair went out from under her and came up against [Seivard]. And in the process of the fall, [Cieler] hit her head on the edge of the table and . . . fell face down on the floor."

Seivard, upon instruction from Kujawski's attorney, then sat in a wheelchair, put on a safety belt, and demonstrated how Cieler reached for the table. With the safety belt on and Seivard reaching out and forward, the wheelchair did not tip over. Seivard also demonstrated that the two belts provided by Kujawski were relatively easy to remove.

Kujawski next called Dr. William T. Brodhead, the orthopedic surgeon who treated Cieler's injuries. Dr. Brodhead testified that Cieler had a scalp laceration which needed sutures and a broken leg (femur bone) which he set. He further testified that the broken leg did not heal and that he and another doctor determined that it was necessary to amputate the leg. On January 28, 1983, Cieler's right leg was amputated above the knee.

Dr. Brodhead also testified that, although a safety belt could be used without coming into contact with Cieler's ventral hernia, normal placement of a safety belt would overlap the hernia. However, it was Dr. Brodhead's opinion that there would be no problem with a belt which touched the hernia because it appeared that the hernia did not bother Cieler. On cross-examination Dr. Brodhead testified that, if the patient said that the hernia was painful, then it would

be inadvisable to use a safety belt. Dr. Brodhead also testified that Cieler suffered from chronic brain syndrome, commonly known as senility.

At the close of plaintiff's evidence, Arbor View moved for dismissal, pursuant to sec. 805.14(3), Stats., on the ground of insufficiency of the evidence. The trial court granted Arbor View's motion to dismiss because no expert testimony was presented to establish the standard of care owed by Arbor View to Cieler. According to the trial court, a determination of whether to use a safety belt of the type suggested by the plaintiff is not a matter within the realm of the ordinary experiences of mankind. The court therefore concluded that the standard of care required of Arbor View had to be established by expert testimony. Because Kujawski did not provide expert testimony, the proof adduced in support of the plaintiff's claim was inadequate. Dismissal was therefore granted.

Kujawski appealed to the court of appeals which affirmed the dismissal. The court of appeals concluded that the adoption of HSS 132.31(1)(k) and 132.60(6) of the Wisconsin Administrative Code, pertaining to the use of restraints in nursing homes, removed the question of whether a physical restraint should be imposed upon a nursing home resident from the conjecture of lay persons. *Kujawski,* 132 Wis. 2d at 181–83. The court therefore concluded that expert testimony was required to establish the standard of care applicable to Arbor View and that Kujawski's failure to provide such testimony warranted dismissal. On July 28, 1986, we accepted Kujawski's petition for review.

The general rule in Wisconsin is that a hospital must exercise such ordinary care as the mental and

physical condition of its patients, known or should have been known, may require. *Cramer v. Theda Clark Memorial Hospital,* 45 Wis. 2d 147, 149, 172 N.W.2d 427 (1969); *Payne v. Milwaukee Sanitarium Foundation, Inc.,* 81 Wis. 2d 264, 272 n. 1, 260 N.W.2d 386 (1977). However, whether expert testimony is necessary to establish what constitutes ordinary care depends upon the type of care involved. *Cramer,* 45 Wis. 2d at 149–50. "If the patient requires professional nursing or professional hospital care, then expert testimony as to the standard of that type of care is necessary." *Id.* at 149. However, if the patient requires nonmedical, administrative, ministerial or routine care, the standard of care need not be established by expert testimony. *Id.* at 150.

The use of expert testimony is limited to instances in which the trier of fact is faced with matters requiring special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind. When the determination involves matters within the common knowledge, no expert testimony is necessary. *Id.*

We have previously held that the determination of negligence, where a nurse leaves a patient unattended and under inadequate restraint, involves matters of routine care and does not require expert testimony. *Id.* at 153–54. In *Cramer* a patient, recently out of surgery, was left unattended by a nurse who had untied the restraint on the patient's right arm. The patient was injured after he untied the remaining restraints and attempted to get up from the bed. In concluding that expert testimony was unnecessary, we noted that "[o]ne does not need to be an expert to be

able to determine whether a person should be in or out of restraints." *Id.* at 154.

■

In this case, we must determine if the court of appeals was correct in affirming the trial court's conclusion that expert testimony is necessary to establish the standard of care applicable to a nursing home's decision not to restrain a patient where it is alleged that the patient has fallen out of her wheelchair on previous occasions. Under *Cramer,* it is clear that a nursing home's use or non-use of a restraint involves a matter of routine care which does not need to be established through expert testimony. In this case, the decision regarding the use of a restraint under the circumstances does not involve a situation so complex or technical that a jury would need expert testimony to determine the appropriate standard of care. One does not need to be an expert to determine whether a patient who has fallen out of her wheelchair, and who is too large to fit comfortably in her wheelchair, should be secured in her wheelchair even if she has a ventral hernia. Accordingly, under *Cramer* expert testimony is unnecessary in this case.

Arbor View, however, argues that a determination of whether to use a restraint requires the exercise of medical judgment by Cieler's attending physician. Thus, contrary to *Cramer,* Arbor View contends that expert testimony is required for plaintiff to prove the standard of care applicable to the use of a restraint on Cieler. Arbor View raises two arguments in support of this contention. Arbor View first asserts that Wis. Adm. Code secs. HSS 132.31(1)(k)[2] and 132.60(6)[3]

---

[2]Wis. Adm. Code sec. HSS 132.31(1)(k) provides, in pertinent part:

require that any placement of restraints upon nursing home residents requires a physician's order. Thus, because a physician's order is a prerequisite, the use of restraints is now a "medical decision" requiring expert testimony, and not a "custodial" or "administrative" decision. This position parallels that of the court of appeals. The court of appeals, after noting that, under *Cramer*, expert testimony is not required to determine whether a hospital patient shall be in or out of restraints, concluded "[s]ince *Cramer* was decid-

"(1) **Residents' Rights.** Every resident shall ... have the right to:

"....

"(k) **Abuse and restraints.** Be free from ... physical restraints except as authorized in writing by a physician for a specified and limited period of time and documented in the resident's medical record .... 'Physical restraint' includes, but is not limited to, any article, device, or garment which interferes with the free movement of the resident and which the resident is unable to remove easily, and confinement in a locked room."

[3]Wis. Adm. Code sec. HSS 132.60(6) provides, in pertinent part:

"(6) **Physical and Chemical Restraints. (a) Definitions.** As used in this subsection, the following definitions apply:

"1. 'Physical restraint' means any article, device, or garment which is used primarily to modify resident behavior by interfering with the free movement of the resident, and which the resident is unable to remove easily, .... Mechanical supports shall not be considered physical restraints.

"2. 'Mechanical support' means any article, device, or garment which is used only to achieve the proper position or balance of the resident, which may include but is not limited to a geri chair, posey belt, jacket, or a bedside rail.

"...

"(b) **Orders required.** Physical ... restraints shall be applied or administered only on the written order of a physician.

"(c) **Emergencies.** A physical restraint may be applied temporarily without an order if necessary to protect the resident or another person from injury."

ed, whether a physical restraint should be imposed upon a resident in a nursing home has been removed from the conjecture of lay persons by regulations of the Department of Health and Social Services." *Kujawski,* 132 Wis. 2d at 181. Second, Arbor View contends that, regardless of whether the requirements of HSS 132 apply, expert testimony is still required because of the mental and physical condition of Cieler. We conclude that both of these contentions are without merit.

We first look at Arbor View's assertion that the adoption of Wis. Adm. Code secs. HSS 132.31(1)(k) and 132.60(6) converted the use of a restraint from a custodial or administrative decision to a medical decision. Arbor View's analysis misinterprets the applicability of HSS 132. It is true that a physical restraint cannot be applied without a physician's order, except in emergency situations. *See* Wis. Adm. Code sec. HSS 132.60(6)(b) and (c). However, a physical restraint is limited to those types of devices which are "used primarily to modify resident behavior" and "which the resident is unable to remove easily." Wis. Adm. Code sec. HSS 132.60(6)(a)1. If the restraint is used for some purpose other than behavior modification, then the restraint is not a "physical restraint," and a physician's order is not required. *See, e.g.,* Wis. Adm. Code sec. HSS 132.60(6)(a)2 (a device used only to achieve the proper position or balance of the resident is a mechanical support and may be applied without a doctor's order).

Logic compels the conclusion that the device suggested by Kujawski does not constitute a physical restraint under Wis. Adm. Code sec. HSS 132.60(6), and thus the use of such a restraint would not require a medical decision. The restraint which Kujawski

alleged Arbor View was negligent in not using was to be used to prevent Cieler from involuntarily falling from her wheelchair; it was not to be used to modify her behavior. This is not to say that a restraint like the one suggested by Kujawski could never constitute a physical restraint. If the restraint was applied to keep a patient from running around the nursing home, the restraint would in that situation be used to modify behavior, and it may then constitute a physical restraint. Because the type of restraint proposed by Kujawski was not to be used for behavior modification, we conclude that the proposed restraint is not a physical restraint, and its use would not require a physician's order.

Moreover, because the purpose behind the proposed safety belt was to prevent involuntary falls, the restraint would, by its very nature, be used to achieve the proper position or balance of the resident. As such, the restraint would constitute a mechanical support under sec. HSS 132.60(6)(a)2 and could, therefore, be imposed without a physician's order. Finally, we note that the restraints demonstrated at trial were relatively easy to remove, and for this reason they would also not constitute a physical restraint. *See* Wis. Adm. Code sec. HSS 132.60(6)(a)1 ("physical restraint" means any ... device ... which the resident is unable to remove easily).

■ Because we conclude that the type of device suggested by Kujawski does not constitute a physical restraint, we hold that secs. HSS 132.60(6) and 132.31(1)(k) of the Wisconsin Administrative Code do not operate to convert the placement of a restraint upon Cieler from a custodial or administrative determination to a medical decision.

467

We next turn to Arbor View's contention that Cieler's mental and physical condition require expert testimony to establish that a restraint could be placed on Cieler while she was in her wheelchair. Although Cieler's mental and physical condition is relevant to a determination of whether Arbor View exercised ordinary care in this case, we do not agree that expert testimony must be presented concerning Cieler's physical or mental ability to use a restraining belt.

Because we conclude that neither Wis. Adm. Code secs. HSS 132.60(6) and 132.31(1)(k) nor the mental and physical characteristics of Cieler operate to alter our determination that Arbor View's use or non-use of restraints involves a matter of routine care, we hold that expert testimony was not required to establish the standard of care applicable to Arbor View.

We further note that the trial court's reliance upon *Payne, supra,* 81 Wis. 2d 264, is misplaced. In *Payne,* a patient with a long history of depression, including at least one suicide attempt, was placed in an open unit at the Milwaukee Psychiatric Hospital. In concluding that expert testimony was necessary to prove negligence, we held that the determination of whether to allow a suicidal patient to have access to matches involved a medical decision as to the proper balance of freedom and confinement likely to be therapeutic to the patient. Thus, because the decision to leave the patient unattended was a matter of therapy, it involved a medical decision requiring expert testimony. In this case, however, the decision to leave Cieler unrestrained does not involve a matter of therapy and, therefore, does not constitute a medical decision requiring expert testimony.

In conclusion, Arbor View argues that, even if it had a duty to provide a safety belt, dismissal on the ground of insufficiency of the evidence was nevertheless appropriate because Kujawski failed to introduce sufficient evidence that the failure to provide a safety belt caused Cieler's injuries.[4] We disagree. In reviewing the sufficiency of the evidence, we consider all credible evidence and reasonable inferences therefrom in the light most favorable to the plaintiff. Unless there is no credible evidence in favor of the plaintiff, a motion to dismiss should not be granted. *Christianson v. Downs,* 90 Wis. 2d 332, 334–35, 279 N.W.2d 918 (1979); sec. 805.14(1), Stats. Moreover, as to causation, we have previously noted that where reasonable persons might differ as to whether the defendant's conduct was the cause of the result—which will include all but a few of the cases in which causation is in dispute at all—the question is one for the jury. *Milwaukee & Suburban Transport Corp. v. Royal Transit Co.,* 29 Wis. 2d 620, 629, 139 N.W.2d 595 (1966).

Viewing the evidence in the light most favorable to Kujawski, we conclude that Kujawski's demonstration, with Seivard's assistance, of how the accident occurred provided credible evidence from which a jury could determine that, if Cieler had been wearing a restraining belt, she would not have fallen from her

---

[4]The lower courts never reached this issue because both courts found the failure to introduce expert testimony to be dispositive. However, because both parties have briefed this issue and because the pertinent evidence is in the record before us, we conclude that the interests of justice will be best served if we consider this issue at this time.

chair. Although the person sitting in the wheelchair was not shown to have the same physical characteristics as Cieler, we decline to hold that this demonstration failed to raise a jury question as to causation.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for a new trial.

STEINMETZ, J. (*dissenting*). I disagree with the statement and therefore the holding of the majority at pages 458–459, of the slip opinion which states:

> "Because we conclude that the determination of whether to use a restraining belt, in the present case, involves a matter of routine care within a jury's common knowledge, we hold that expert testimony was not necessary to establish the standard of care applicable to the nursing home."

The present case involves the claim of the estate of the deceased, Angela Cieler. She had a ventral hernia which extended from the base of her sternum to just above her pubis which puffed out from her stomach like a balloon.

The majority summarizes the testimony of Dr. William Brodhead, the orthopedic surgeon, as follows:

> "[A]lthough a safety belt could be used without coming into contact with Cieler's ventral hernia, normal placement of a safety belt would overlap the hernia. However, it was Dr. Brodhead's opinion that there would be no problem with a belt which touched the hernia because it appeared that the hernia did not bother Cieler. On cross-examination Dr. Brodhead testified that, if the patient said that the hernia was painful, then it would be inadvisable to use a safety belt." (Majority opinion at pages 461–462.)

470

By the very nature of his equivocating testimony, it is only logical and reasonable to find that the issue of the use of a restraining belt did not involve a matter of routine care within a jury's common knowledge.

I agree with the trial court and the court of appeals that Arbor View's motion to dismiss was properly granted because no expert testimony was presented to establish the standard of care owed by Arbor View to Cieler on the issue of the use of a safety belt to restrain her in the wheelchair. This is not nonmedical, administrative, ministerial or routine care as found by the majority at page 8 of the slip opinion. The hernia this woman had required medical determinations as to any intrusion regarding it. A medical decision was necessary as to the propriety and effectiveness of a safety belt due to her condition, as well as the type of belt, the amount of pressure she could withstand and the location for placement of the belt due to her hernia. Placement of an undefined belt by a nonmedical person in attendance, such as in this case, a woman who was a volunteer, if misdirected as to the hernia would be a cause for a claim of negligent care and treatment. Medical decisions were required in handling her condition and therefore expert testimony of the plaintiffs was necessary to establish the standard of care required regarding the use or absence of a safety belt. Such circumstances are not within the realm of the ordinary experience of mankind, are not matters of common knowledge, and, therefore, a special skill or experience on the subject is necessary which requires expert testimony.

The majority opinion does not require the plaintiffs to offer expert testimony on the matter of the use of a safety belt in spite of this woman's massive hernia; however, as I understand it, the testimony of

an expert witness called by the defendants on the subject is not ruled out.

I dissent and would affirm the court of appeals.