Stephen M. KAILIN, and Linda S. Kailin,
Plaintiffs-Appellants,

v.

Perry J. ARMSTRONG, Defendant-Respondent,

FIRST WEBER GROUP, INC. and Robert H. Carpenter,
Defendants-Third-Party Plaintiffs-Respondents,

v.

RESTAINO BUNBURY & ASSOCIATES and Donald J.
Dantinne, Third-Party Defendants-Respondents.

Court of Appeals

*No. 01–1152. Submitted on briefs October 5, 2001.—Decided
February 28, 2002.*

2002 WI App 70

(Also reported in 643 N.W.2d 132.)

677

678

679

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Gregory P. Seibold* of *Murphy & Desmond, S.C.*, Madison.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Michael B. Van Sicklen* and *Marta T. Meyers* of *Foley & Lardner*, Madison.

On behalf of the defendants-third-party plaintiffs-respondents, the cause was submitted on the brief of *Craig R. Johnson* of *Loniello, Johnson, Simonini & Chavez*, Madison.

Before Vergeront, P.J., Roggensack and Lundsten, JJ.

¶ 1. VERGERONT, P.J. This appeal arises out of a

commercial real estate transaction in which Stephen and Linda Kailin purchased from Perry Armstrong the property known as the Monona Center. The Kailins appeal the summary judgment in favor of Armstrong, First Weber Group, Inc., and salesperson Robert Carpenter, which dismissed the Kailins' claims for breach of contract, intentional misrepresentation, and violation of Wis. Stat. § 100.18 (1999–2000).[1] The complaint alleged the defendants failed to disclose that one of the tenants had a history of delinquency in rent payments and was in default both at the time the offer to purchase was accepted and at the time of closing.

¶ 2. Concerning the claims against Armstrong, we conclude: (1) the trial court erred in granting summary judgment in favor of Armstrong on the breach-of-contract claim; (2) insofar as the claim for intentional misrepresentation is based on representations or failure to disclose occurring after acceptance of the offer to purchase, it is barred by the economic loss doctrine; insofar as it is based on representations or failure to disclose occurring prior to that date, it is not barred by the economic loss doctrine and there is a genuine issue of material fact precluding summary judgment in favor of Armstrong; (3) the economic loss doctrine does not bar the Kailins' claims under Wis. Stat. § 100.18, but the statute does not apply to representations made after the acceptance of the offer to purchase because statements made to the other party to a contract are not statements made "to the public"; and (4) the Kailins need not present expert testimony to prove their claims. Accordingly, we affirm in part, reverse in part, and remand for further proceedings against Armstrong.

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

¶ 3. Concerning the claims against First Weber and Carpenter, for the reasons we explain below, we affirm the summary judgment dismissing all claims.

## BACKGROUND

¶ 4. Most of the facts are undisputed for purposes of this appeal, and we will indicate in our summary where there is a dispute.

¶ 5. The Kailins, represented by Restaino Bunbury & Associates and Donald Dantinne, submitted an offer to purchase the Monona Center on December 7, 1998.[2] Armstrong submitted a counteroffer regarding price, which was rejected by the Kailins, but, on December 9, 1998, Armstrong accepted the Kailins' counteroffer regarding a price of $760,000.[3]

¶ 6. The accepted offer provided that:

> Seller represents to Buyer that as of the date of acceptance Seller had no notice or knowledge of conditions affecting the Property or transaction (as defined in lines 159 to 178) other than those identified in Seller's disclosure report dated 01/05/98 which was received by Buyer prior to Buyer signing this Offer . . . .[4]

Included in the definition of "Conditions Affecting the Property or Transaction" is "(o) Other conditions or occurrences which would significantly reduce the value

[2] The offer to purchase was the WB-15 Commercial Offer to Purchase (Mandatory Use Date 4–1-96) approved by the Wisconsin Department of Regulation and Licensing.

[3] The Kailins' counteroffer also extended the time period for environmental inspection.

[4] We have been unable to locate the seller's disclosure report in the record. *See* footnote 6.

of the Property to a reasonable person with knowledge of the nature and scope of the condition or occurrence."

¶ 7. Before Dantinne submitted the Kailins' offer to purchase, Carpenter provided him with lease information on a document that listed the eight commercial tenants of Monona Center, the lease expiration dates, and the monthly and annual rent under each lease ("Lease Information").[5] Before the offer to purchase, Carpenter also provided Dantinne with a document entitled "Estimated Income and Expense" for the Monona Center, which stated "Income: Current Leases $146,700," itemized a number of expenses, and stated "Estimated Net Operating Income $82,400."[6]

---

[5] The Lease Information showed that one address at the Monona Center was vacant.

[6] Dantinne testified at his deposition that he was not sure if he had this document at the time of the submission of the offer to purchase or after it was accepted, but Stephen Kailin testified that he believed they did have it at the time of the submission.

There appears to be some confusion in the parties' briefs and in the record over a document entitled "Monona Center 1998 Operations," which the Kailins identify in their Appendix as A-App. 41; they assert at page 5 of their main brief that this was provided to them or their agent after the offer was accepted. However, none of the record cites enlighten us as to when this document was provided to the Kailins or their agents, and we find this document in the record apparently misidentified as the "Real Estate Condition Report prepared and signed by defendant by Perry J. Armstrong." *See* R.25:3, identifying Exhibit I at R.25:99. (We cannot locate the Real Estate Condition Report in the record.) Armstrong, in his brief at page 6, refers to a "statement of estimated income and expenses through July 1998," but, based on the record cite, he is referring to the document entitled "Estimated Income and Expense," which we have described in the accompanying text and which

¶ 8. One of the eight leases was with Ring's All-American Karate (Ring Karate), which rented 6,500 square feet of the 20,501 rentable square feet.[7] Under Ring Karate's five-year lease, its monthly rent began at $3,012 on November 1, 1995, and increased annually; at the time of the Kailins' offer to purchase, Ring Karate's monthly rent was $4,410. In February 1997, Armstrong and Ring Karate signed an amended rent schedule because of financial difficulties Ring Karate was having; this permitted Ring Karate to pay a total of $1,200 less in rent for the months February through October 1997. Armstrong did not provide the amended rent schedule to the Kailins at any time prior to or at the closing.

¶ 9. In October 1998, Ring Karate again had problems in paying rent and fell behind. At the time of the Kailins' offer to purchase, Ring Karate owed $9,520 for October, November, and December.[8] There is evidence that on December 11, 1998, Armstrong sent via fax to Carpenter a rent roll updated to December 9, 1998, that showed Ring Karate's rent arrears at that time, but the evidence whether Carpenter provided this to Dantinne is conflicting. There is also evidence that Armstrong asked Carpenter sometime in December 1998 or January 1999 whether he had an obligation to

---

does not contain a date. Whether and when the "Monona Center 1998 Operations" was provided to the Kailins or their agents does not affect our analysis.

[7] One document Armstrong or his agents provided showed a total of 20,501 square feet of rentable space, excluding storerooms and other miscellaneous areas. However, the December 9, 1998 rent roll shows 17,248 square feet of rentable space. The Kailins use the former figure in their brief and Armstrong does not object.

[8] According to Armstrong, the rent for each month was due on the first of each month.

disclose Ring Karate's rent delinquency to the Kailins, and Carpenter answered that he did not know of any.[9]

¶ 10. The closing took place on February 1, 1999. On that date, Armstrong assigned his title and interest in the eight leases to the Kailins and warranted that there were no defaults under the leases on that date. Since Ring Karate did not pay any rent in January 1999, at the time of the closing on February 1, 1999, Ring Karate owed $13,910, not counting February. At no time did the Kailins ask for information on the status of the tenants' rent payments.

¶ 11. Ring Karate continued to fail to pay rent after the closing and eventually vacated the Monona Center.[10]

¶ 12. The Kailins' complaint asserted claims for breach of contract, misrepresentation in violation of WIS. STAT. § 100.18, and intentional, negligent, and strict liability misrepresentation. Armstrong moved for summary judgment on all claims, contending there was no dispute that Armstrong provided full and accurate information. In support of this contention, Armstrong asserted that there was no evidence that the Kailins requested information on the status of rental payments prior to closing, or that any of the information he provided the Kailins prior to closing was inaccurate. Alternatively, Armstrong argued with respect to the contract claim that the contract did not obligate him to provide the information on Ring Karate's rent arrear-

---

[9] Armstrong testified to this conversation, but Carpenter denied it took place.

[10] The Kailins assert in their brief that the Rings filed bankruptcy and obtained a discharge of the amount owed them, but there is no record citation.

688

ages and, with respect to the tort and statutory claims, that the economic loss doctrine precluded recovery as a matter of law.

¶ 13. The trial court agreed with Armstrong that the contract did not require him to disclose Ring Karate's failure to pay rent as required by the lease during October 1 through December 1, 1998, because the court decided that type of information was not included within the definition of "conditions affecting the property or transaction." The court also decided that recovery on the tort claims for any representations after December 9, 1998, the date the offer was accepted, was barred by the economic loss doctrine. With respect to any representations made on or before that date, the court acknowledged that the economic loss doctrine might not bar all claims for fraudulent inducement to enter into a contract; however, the court concluded that in this case such a claim was barred by the doctrine.[11] The court dismissed the claim for a violation of WIS. STAT. § 100.18 because it concluded that statute merely added a remedy for the common law misrepresentation claims and did not create an independent claim for relief. The factual dispute concerning the December 9, 1998 rent roll was not relevant to the trial court's analysis on any of the claims.

¶ 14. First Weber and Carpenter also moved for summary judgment on the ground that they did not breach any duty imposed on them by WIS. STAT. ch.

---

[11] The court reasoned that this was a substantial commercial transaction; the Kailins were assisted by a real estate broker, an attorney, and a CPA; the Kailins never made inquiries about the current status of rent; there was no evidence that Armstrong or his agents made any affirmative representation that was fraudulent; and the Kailins were not seeking rescission of the contract, but a remedy premised on the contract.

689

452.[12] The trial court agreed, concluding that it was undisputed that they did not discover the fact of Ring Karate's rent delinquency until after December 9, 1998, when the Kailins and Armstrong had entered into a binding contract.

## DISCUSSION

■■■■■

¶ 15. We review a decision granting summary judgment de novo, applying the same methodology as the trial court. *Brownelli v. McCaughtry*, 182 Wis. 2d 367, 372, 514 N.W.2d 48 (Ct. App. 1994). Summary judgment is appropriate if there are no genuine issues of material fact and one party is entitled to judgment as a matter of law. *See id.* at 372–73.

---

[12] WISCONSIN STAT. § 452.133(1)(c) provides:

> **Duties of brokers. (1)** DUTIES TO ALL PARTIES TO A TRANSACTION. In providing brokerage services to a party to a transaction, a broker shall do all of the following:
>
> . . . .
>
> (c). Disclose to each party all material adverse facts that the 0broker knows and that the party does not know or cannot discover through reasonably vigilant observation, unless the disclosure of a material adverse fact is prohibited by law.

WISCONSIN STAT. § 452.01(5g) provides:

> **(5g)** "Material adverse fact" means an adverse fact that a party indicates is of such significance, or that is generally recognized by a competent licensee as being of such significance to a reasonable party, that it affects or would affect the party's decision to enter into a contract or agreement concerning a transaction or affects or would affect the party's decision about the terms of such a contract or agreement.

690

## A. *Claims Against Armstrong*

*Breach of Contract*

¶ 16. The Kailins claim that the trial court erred in its interpretation of the "Property Condition Representations" and that Armstrong breached this provision, specifically subparagraph (o), by not disclosing Ring Karate's rent delinquency. They contend that Ring Karate's failure to pay rent as required by the lease is a "condition[] or occurrence[] which would significantly reduce the value of the [p]roperty to a reasonable person with knowledge of the nature and scope of the condition or occurrence." They point out that a reasonable person acquiring a commercial property such as the Monona Center does so for the purpose of receiving rental income from the businesses that occupy the commercial spaces, and therefore the amount of rental income that the seller has received and is receiving is a significant factor in a reasonable person's assessment of the value of the property. They argue that the value of the property would be reduced to a reasonable person if he or she knew that a tenant, who was responsible for more than a third of the total rental income, had in the past not been able to pay the full rent required under the lease and currently was delinquent to the degree Ring Karate was at the time the offer was accepted and at the time of closing.

¶ 17. Armstrong argues in response that the trial court correctly decided that the description in subparagraph (o) relates only to conditions of the real estate and not to the status of rent payments under the tenants' leases. In Armstrong's view, similar to that of the trial court, the other descriptions of "Conditions Affecting the Property or Transaction" address condi-

tions affecting the real estate itself, and therefore subparagraph (o) must be read in the same manner.[13]

[13] The accepted offer stated, in relevant part:

*CONDITIONS AFFECTING THE PROPERTY OR TRANS-ACTION:* A "condition affecting the Property or transaction" is defined as follows:

(a) Planned or commenced public improvements which may result in special assessments or otherwise materially affect the Property or the present use of the Property;

(b) Government agency or court order requiring repair, alteration or correction of any existing condition;

(c) Completed or pending reassessment of the Property for property tax purposes;

(d) Structural inadequacies which if not repaired will significantly shorten the expected normal life of the Property;

(e) Any land division involving the Property, for which required state or local approvals were not obtained;

(f) Construction or remodeling on the Property for which required state or local approvals were not obtained;

(g) Any portion of the Property being in a 100 year floodplain, a wetland or shoreland zoning area under local, state or federal regulations;

(h) That a structure on the Property is designated as a historic building or that any part of the Property is in a historic district;

(i) Material violations of environmental laws or other laws or agreements regulating the use of the Property;

(j) Conditions constituting a significant health or safety hazard for occupants of the Property;

(k) Underground storage tanks on the Property for storage of flammable or combustible liquids including but not limited to gasoline and heating oil; *NOTE: The Wisconsin Administrative Code contains registration and operation rules for such underground storage tanks.*

¶ 18. In order to resolve this issue, we must first interpret the contract language. The construction of a written contract is a question of law, which we review de novo. *Waukesha Concrete Prods. Co. v. Capitol Indem. Corp.*, 127 Wis. 2d 332, 339, 379 N.W.2d 333 (Ct. App. 1985). If the terms of the contract are plain and unambiguous, it is our duty to construe the contract according to its plain meaning even though one of the parties may have construed it differently. *Id.*

¶ 19. We conclude that subparagraph (o)—"Other conditions or occurrences which would significantly reduce the value of the Property to a reasonable person with knowledge of the nature and scope of the condition or occurrence"—plainly encompasses occurrences of rent delinquencies that otherwise come within the contract definition, that is, rent delinquencies that would significantly reduce the value of the property to a reasonable person. We agree with the Kailins that a reasonable person would view the amount of rental income the owner receives as critical to valuing this property, and Armstrong does not argue otherwise. The

(l) Underground or aboveground storage tanks for storage of flammable, combustible or hazardous materials including but not limited to gasoline and heating oil, which are currently or which were previously located on the Property;

(m) High voltage electric (100 KV or greater) or steel natural gas transmission lines located on but not directly serving the Property;

(n) Material levels of hazardous substances located on Property, or previous storage of material amounts of hazardous substances on Property;

(o) Other conditions or occurrences which would significantly reduce the value of the Property to a reasonable person with knowledge of the nature and scope of the condition or occurrence.

accepted offer specifically provides that the seller will assign all its rights under leases that extend past closing, and Addendum B provides that the offer "is subject to Buyer[] receiving leases within (5) days of acceptance of this offer," and gives the buyer the option of disapproving the leases and voiding the offer. These provisions, as well as Armstrong's warranty in the lease assignments at closing—that no lessee is in default under the terms of the leases—are all indications that both parties understood that the terms of the leases and the status of payments under the leases were significant to the transaction, and they support interpreting subparagraph (o) as encompassing rent delinquencies that otherwise meet the description in that subparagraph.

¶ 20. We do not agree with Armstrong that subparagraph (o) includes only conditions that affect the physical real estate and not its value: the language is broader than that. The term defined is "Conditions Affecting The Property *Or Transaction*," (emphasis added), not simply "Conditions Affecting The Property." Most of the other definitions do relate to physical conditions affecting real estate itself, but not all do, e.g.: "public improvements which may result in special assessments" (subparagraph (a)) and "[c]ompleted or pending reassessments of the Property for property tax purposes" (subparagraph (c)). More importantly "conditions or occurrences" in subparagraph (o) are not limited to conditions affecting the physical real estate, but are expressly defined in terms of their effect on the value of the property.

¶ 21. We also do not agree with Armstrong that the "Document Review Contingency" supports his interpretation of subparagraph (o). This provision states that within ten days of acceptance, Armstrong was to deliver to the Kailins "1996 & 1997 Schedule 'E' tax

694

returns and 1998 profit/loss statements to date."[14] Armstrong argues that if the Kailins wanted him to provide information on rental payments, they should have specified it in this section; alternatively, if the Kailins expected that such information would be contained in "1996 & 1997 Schedule 'E' tax returns and 1998 profit/loss statements to date" and it was not, they failed to notify him that the contingency was not satisfied. However, the "Property Condition Representations" are not defined with reference to or limited by the "Document Review Contingency." Therefore, the fact that Armstrong may not have been required to provide certain information under the "Document Review Contingency" does not mean that failure to disclose that information cannot be a breach of the "Property Condition Representations."

¶ 22. The fact that the Kailins did not include a specific provision requiring disclosure of rent delinquencies in the offer to purchase does not, as Armstrong contends, mean that subparagraph (o) does not include rent delinquencies in the description of "conditions or occurrences." Subparagraph (o) is obviously intended to include conditions or occurrences that are not specifically listed, but that a buyer would want to know about because of their effect on the value of the

---

[14] The provision also states that the contingency was deemed satisfied unless the Kailins, "within ten days of the earlier of receipt of the final record to be delivered or the deadline for delivery of the documents," gave Armstrong a written notice that the contingency had not been satisfied. It is undisputed that the Kailins did not provide a notice that the document contingency was not satisfied.

property. If every such condition or occurrence were specifically stated, there would be no need for subparagraph (o).

■

¶ 23. Having concluded that subparagraph (o) may include rent delinquencies that otherwise meet the requirements of that description, the question becomes whether Ring Karate's rental delinquencies meet those requirements. We observe first that all the "Property Condition Representations" are limited to those (other than those identified on the "Seller's disclosure report dated 01/05/98") of which "as of the date of acceptance [Armstrong] had no notice or knowledge." There is no dispute that on December 9, 1998, Armstrong knew of Ring Karate's then-existing rent delinquency and of its financial difficulties in 1997 that resulted in an amended rent schedule.

¶ 24. We next consider whether Ring Karate's rent delinquency would significantly reduce the value of the property to a reasonable person who knew that information. Because we are reviewing a summary judgment, we consider first whether there are any genuine issues of material fact with respect to this question, and we conclude there are none. The type of property, the number of tenants, their obligations under their leases, and Ring Karate's obligation, payments, and payment history are all relevant facts and are not disputed. Based on the undisputed facts, we conclude that Ring Karate's payment difficulties in 1997 and the resulting rent reduction, coupled with its failure to pay the required rent when due in October, November, and December 1998, such that it owed $9,520 on December 9, would, in the view of a reasonable person, significantly reduce the value of the property. Ring Karate's annual rental obligation was pro-

jected at $52,920 in 1999, more than one-third of the rental income from all tenants. A reasonable person would view Ring Karate's failure to pay the rent required under its lease as significantly reducing the value of the property because: that failure significantly reduces the income received from the property while Ring Karate remains a tenant without meeting its obligation; an expenditure of funds is likely required to evict Ring Karate and to locate a new tenant; and there is the prospect of an empty space generating no income—about 30% of the total rentable space—until a new tenant is found.

■

¶ 25. The next question that arises is the effect of Armstrong's breach of the representation that at the time he accepted the offer, he knew of no conditions affecting the property or transaction other than those contained in "Seller's disclosure report dated 01/05/98." Neither of the parties address this question, although they appear to agree that whether Carpenter provided Dantinne with the December 1998 rent roll before closing is a genuine issue of material fact.[15] Our independent research has disclosed no breach-of-contract case discussing the effect of a breach of a representation in a contract for the sale of real estate that is expressly

[15] The Kailins argue that this fact is disputed and is material to whether Armstrong "cured the breach." Armstrong does not contend that this fact is not disputed, but simply asserts it is not relevant if we accept his interpretation of the contract. He does not discuss whether it is relevant if we reject his interpretation. However, based on his arguments in the trial court, it would appear he agrees that if his interpretation does not prevail, then it is necessary to determine whether Carpenter provided Dantinne with the December 1998 rent roll prior to closing.

limited to "as of the date of acceptance,"[16] and no breach-of-contract case discussing the effect of a buyer's discovery of a breach of a seller's representation before closing, where the contract did not address that situation.[17] On remand, the parties will have the opportunity

---

[16] In *Dittman v. Nagel*, 43 Wis. 2d 155, 162–64,168 N.W.2d 190 (1969), the court held that the buyer had to prove a breach of the warranty of a property condition as of the date of closing because, even though the warranty was contained in the offer to purchase, it related to the condition of the property at the time title was actually conveyed. However, the warranty there, unlike the representation in this case, was not expressly limited to "as of the date of acceptance." In *Dittman*, the court applied the general definition of warranty to contracts for the sale of real estate:

> A 'warranty' is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended to relieve the promisee of any duty to ascertain the fact for himself, and amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue.

*Id.* at 160 (citation omitted). In *Kain v. Bluemound East Industrial Park, Inc.*, 2001 WI App 230, ¶ 24, 248 Wis. 2d 172, 635 N.W.2d 640, we held that a warranty that the soil "will satisfactorily support a minimum of 3,000 pounds [per square foot]" was not limited to the time it was made, but had prospective application because of the use of the word "will"; therefore, it applied to the time at which the buyer constructed a building on the property.

[17] In *Lambert v. Hein*, 218 Wis. 2d 712, 730, 582 N.W.2d 84 (Ct. App. 1998), the court held that the buyers of residential property waived their claim for breach of warranty when they closed on a transaction after learning of the property defect from their own inspection. However, the court relied on the language in the accepted offer to purchase providing that a buyer's failure to submit a written disapproval of the Seller's Property Condition Report within a specified period after conducting an inspection constituted acceptance of the property

to address any legal issues that remain on the breach-of-contract claim, as well as the opportunity to try the factual issues.

*Intentional Misrepresentation*

¶ 26. The Kailins contend that the trial court erred in ruling that the economic loss doctrine bars their claim of intentional misrepresentation for misrepresentations Armstrong made before the offer to purchase was accepted, after it was accepted but before closing, and at closing.

¶ 27. The economic loss doctrine is a judicially created doctrine under which a purchaser of a product cannot recover from a manufacturer on a tort theory for damages that are solely economic. *Mose v. Tedco Equities—Potter Rd. Ltd. P'ship*, 228 Wis. 2d 848, 853, 598 N.W.2d 594 (Ct. App. 1999). When contractual expectations are frustrated because of a defect in the subject matter of the contract and the only damages are economic losses, the exclusive remedy lies in contract. *See id.* The policies underlying this doctrine are: (1) to protect the parties' freedom to allocate economic risk by contract;[18] (2) to encourage the party best situated to assess the risk of economic loss—the purchaser—to

"as is." *Id.* at 726–30. There is no similar language in the accepted offer to purchase in this case.

[18] Since commercial parties are capable of bargaining to allocate the risk inherent in any commercial transaction, an absence of comprehensive warranties is presumably reflected in the purchase price. *Mose v. Tedco Equities—Potter Rd. Ltd. P'ship*, 228 Wis. 2d 848, 854, 598 N.W.2d 594 (Ct. App. 1999). The economic loss doctrine was extended to consumer transactions in *State Farm Mutual Automobile Insurance Co. v. Ford*

assume, allocate, or insure against that risk; and (3) to maintain the fundamental distinction between tort law and contract law.[19] *Douglas-Hanson Co. v. BF Goodrich Co.*, 229 Wis. 2d 132, 149 n.3, 598 N.W.2d 262 (Ct. App. 1999). Although the economic loss doctrine was developed in the context of defective product claims, it applies when real estate is the subject of the contract. *Mose*, 228 Wis. 2d at 859.

¶ 28. In *Douglas-Hanson*, 229 Wis. 2d at 140, the purchaser pleaded both a breach-of-contract claim and a claim for intentional misrepresentation inducing it to enter into the contract, but elected to proceed on the latter at trial. The seller argued on appeal that under the economic loss doctrine, the purchaser was limited to contract damages. *Id.* at 145. We held that the economic loss doctrine did not apply when there was an intentional misrepresentation fraudulently inducing a party to enter into a contract. *Id.* at 149–50. Our rationale was that when an intentional misrepresentation fraudulently induces a party to enter into a contract, the parties appear to negotiate freely, but, in fact, one party's ability to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent conduct. *Id.* at 144–45. We also reasoned that a person fraudulently induced to enter into a contract may affirm or avoid the contract, and, in thus electing, has the option of selecting tort or contract damages, an "option [that] is inconsistent with the economic loss doctrine . . . which requires that the

*Motor Co.*, 225 Wis. 2d 305, 348, 592 N.W.2d 201 (1999) to bar tort claims of purely economic loss.

[19] If a party is permitted to sue in tort when a transaction does not work out as expected, that party is in effect rewriting the agreement to obtain a benefit that was not part of the bargain. *Mose*, 228 Wis. 2d at 854.

contract be affirmed." *Id.* at 145. Finally, we pointed out that when a party is dishonest about the subject matter of the contract, the party best situated to assess and allocate the risk is the seller, not the buyer, and that is contrary to the premise of the economic loss doctrine. *Id.* at 146–47.

¶ 29. The Kailins are asking us to broaden the exception in *Douglas-Hanson* to misrepresentations that occurred after the offer to purchase was accepted. The acceptance of the offer to purchase created a binding contract in which they agreed to buy the real estate and Armstrong agreed to sell it. *Dittman v. Nagel*, 43 Wis. 2d 155, 163, 168 N.W.2d 190 (1969). Although the sale does not take place until legal title is transferred at closing, *id.*, when Armstrong accepted the Kailins' counteroffer to purchase on December 9, their rights and obligations were fixed in the resulting contract.

¶ 30. In *Douglas-Hanson*, 229 Wis. 2d at 149–50, we specifically limited our holding to intentional misrepresentations that fraudulently induced a party to enter into a contract. We will therefore apply the economic loss doctrine in this case to any misrepresentations that occurred after the contract was formed on December 9, 1998. None of the reasons for our holding in *Douglas-Hanson* applies when a misrepresentation is made after the contract is formed, and the Kailins have not advanced any persuasive reason why the economic loss doctrine should not apply to such misrepresentations. Such misrepresentations do not prevent the buyer from negotiating the terms of the contract freely and fairly; they cannot be a basis for voiding the contract; and they do not affect the presumption underlying the economic loss doctrine that the commercial

purchaser is the best situated to assess the economic loss and assume, allocate, or insure against that loss.

¶ 31. We limit our analysis, then, to the Kailins' claim that Armstrong made intentional misrepresentations that induced them to enter into the contract.[20] The elements of this claim—which we will refer to as fraud in the inducement—are: a statement of fact that is untrue, made with the intent to defraud, and for the purpose of inducing the other party to act on it, which the other party relies on to his or her detriment, where the reliance is reasonable. *Douglas-Hanson*, 229 Wis. 2d at 144 n.2.[21]

¶ 32. A failure to disclose a fact may be a misrepresentation for purposes of an intentional misrepresentation claim only if the person who failed to disclose had a duty to do so. *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17,

---

[20] We do not understand the Kailins to appeal the claims for negligent and strict liability misrepresentation. However, if the Kailins are asking that we broaden the exception in *Douglas-Hanson* to misrepresentations that are not intentional, we decline to do so. In *Prent Corp. v. Martek Holdings, Inc.*, 2000 WI App 194, ¶ 24, 238 Wis. 2d 777, 618 N.W.2d 201, we emphasized that in *Douglas-Hanson* we carefully limited the available claim to *intentional* misrepresentations, and we applied the economic loss doctrine to bar a negligent misrepresentation that induced a contract. We see no reason to depart from our reasoning in *Prent Corp.* with respect to the Kailins' claims for negligent misrepresentation or strict liability misrepresentation.

[21] These are essentially the same elements for intentional misrepresentation as set forth in *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 25, 288 N.W.2d 95 (1980), phrased in the specific context of misrepresentations that induce a party to enter into a contract.

26, 288 N.W.2d 95 (1980). A person has a duty to disclose "matters known to him [or her] that he [or she] knows to be necessary to prevent his [or her] partial or ambiguous statement of the facts from being misleading." RESTATEMENT (SECOND) OF TORTS § 551(2)(b) (1977), *quoted in Ollerman*, 94 Wis. 2d at 36 n.18.

¶ 33. The two documents that Armstrong or his agents provided the Kailins or their agents prior to December 9, 1998, were the Lease Information and the Estimated Income and Expense. To prevail on their claim for fraud in the inducement, the Kailins must establish that Armstrong had a duty to disclose Ring Karate's arrearages as of December 1998 in order to prevent the two documents he did provide from being misleading. Since we are reviewing a decision on a motion for summary judgment, the question is whether the parties' submissions reveal genuine disputes of material fact, entitling the Kailins to a trial on this issue. A factual dispute is "genuine" if the evidence is such that a reasonable fact finder could find in the nonmoving party's favor. *Baxter v. DNR*, 165 Wis. 2d 298, 312, 477 N.W.2d 648 (Ct. App. 1991). In our inquiry, we are to draw all reasonable inferences in the Kailins' favor. *See Grams v. Boss*, 97 Wis. 2d 332, 339, 294 N.W.2d 473 (1980). Applying this standard, we conclude there is a genuine dispute of material fact.

¶ 34. The Estimated Income and Expense document does not contain a date. However, because it was provided in late 1998, it is reasonable to infer that Armstrong actually expected to receive $146,700 in income from the current leases in 1998. Since Armstrong would receive that amount of income only if all the tenants listed on the Lease Information paid the full rent due under their leases as specified in that docu-

ment, it is reasonable to infer that Armstrong had received all the rent due under all the leases up to the date on which the Estimated Income and Expense document was provided the Kailins or their agents, and also that he had no reason to expect that he would not receive any rental income due before the end of 1998. We therefore conclude that a reasonable fact finder could decide that the Estimated Income and Expense document was ambiguous as to whether it was representing that there were no actual or anticipated rent delinquencies for the year 1998; a reasonable fact finder could also decide that failure to disclose Ring Karate's delinquency for 1998 made that document misleading. The evidence that Armstrong asked Carpenter if he had an obligation to disclose this information to the Kailins supports an inference that Armstrong knew that, without that information, the documents he had provided were misleading.

¶ 35. Armstrong points to the following language at the bottom of each of the two documents in support of his position that neither makes any representations about actual rental income: "Information deemed reliable but not guaranteed. The information contained herein was provided by the seller and/or other third parties and has not been verified by the Broker unless otherwise indicated." However, this language does not remove the ambiguity in the Estimated Income and Expense document. First, a reasonable reading of this language is that it limits the broker's liability in the event the document contains inaccurate information, but does not indicate that the reader cannot rely on the information as a representation made by the seller. Second, this statement addresses the accuracy of the

information and not whether it is ambiguous and therefore misleading without additional information.

¶ 36. We conclude that genuine issues of material fact preclude summary judgment on the Kailins' claim for fraud in the inducement.

*WIS. STAT. § 100.18*

■

¶ 37. The Kailins contend the trial court erred in concluding that the economic loss doctrine applied to their claim under WIS. STAT. § 100.18(1), the false advertising statute. Armstrong responds that the trial court correctly ruled that § 100.18 simply provides additional remedies for common law misrepresentation claims, and therefore the common law doctrine barring misrepresentation claims for purely economic loss applies to claims under § 100.18(1).[22]

---

[22] We observe that we have already concluded that the economic loss doctrine does not apply to fraudulent inducement claims. Therefore, even if Armstrong were correct that the economic loss doctrine applies to claims under WIS. STAT. § 100.18, just as it does to common law misrepresentation claims, that doctrine would not bar the Kailins' claim under § 100.18 insofar as it is based on intentional misrepresentations that induced them to enter into the contract. However, because § 100.18 does not require an intent to defraud, only an intent "to sell . . . or . . . induce . . . to enter into any contract or obligation," and because the exception to the economic loss doctrine applies only to intentional misrepresentations, *Prent Corp.*, 2000 WI App 194 at ¶ 24, there may be facts in this case that support a claim for a violation of § 100.18, but not a claim for fraudulent inducement. Therefore, we address the issue whether the economic loss doctrine applies to § 100.18.

¶ 38. The interpretation of a statute is a question of law, which we review de novo. *State v. Setagord*, 211 Wis. 2d 397, 405–06, 565 N.W.2d 506 (1997). The purpose of all statutory construction is to discern the legislature's intent. *Id.* at 406. We begin with the language of the statute and if that plainly conveys the intent of the legislature, we apply that language to the facts at hand. *Id.*

¶ 39. WISCONSIN STAT. § 100.18(1) provides in relevant part:

> **Fraudulent representations. (1)** No person, firm, corporation or association, or agent or employee thereof, with intent to sell . . . real estate . . ., or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase . . . of any real estate . . ., shall make . . . an advertisement, announcement, statement or representation of any kind to the public relating to such purchase [or] sale . . . of such real estate . . . or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

WISCONSIN STAT. § 100.18(11)(b)2 and 3 provides in part:

> (b) 2. Any person suffering pecuniary loss because of a violation of this section by any other person may sue in any court of competent jurisdiction and shall recover such pecuniary loss, together with costs, including reasonable attorney fees, except that no attorney fees may be recovered from a person licensed under ch. 452 while that person is engaged in real estate practice, as defined in s. 452.01(6) . . . .
>
> 3. No action may be commenced under this section more than 3 years after the occurrence of the unlawful

act or practice which is the subject of the action. No injunction may be issued under this section which would conflict with general or special orders of the department or any statute, rule or regulation of the United States or of this state.

¶ 40. Read together, the above subsections plainly define the elements for a cause of action, with its own statute of limitations, WIS. STAT. § 100.18(11)(b)3, and without reference to common law misrepresentation claims. The elements of this cause of action differ from those of the common law claims of intentional misrepresentation, strict liability misrepresentation, and negligent misrepresentation;[23] each of those has elements not necessary for a claim under this statute, and the statute has elements none of those have—such as the

---

[23] The three classifications of torts—intentional misrepresentation, strict liability misrepresentation, and negligent misrepresentation—all require the following elements: (1) the representation must be of a fact and made by the defendant; (2) the representation of fact must be untrue; and (3) the plaintiff must believe such representation to be true and rely thereon to his or her detriment. *Ollerman*, 94 Wis. 2d at 25.

Additionally, intentional misrepresentation requires the defendant: (1) either know the representation is untrue or recklessly make the representation without caring whether it is true or false; and (2) make the representation with the intent to deceive and to induce the plaintiff to act upon it to the plaintiff's pecuniary damage. Strict liability misrepresentation also requires: (1) the representation be made on the defendant's personal knowledge or under circumstances in which he or she necessarily ought to have known the truth or untruth of the statement; and (2) the defendant must have an economic interest in the transaction. Finally, negligent misrepresentation requires the defendant: (1) have a duty of care or a voluntary assumption of a duty; and (2) fail to exercise ordinary care in making a representation or in ascertaining the facts. *Id.*

requirement that the "advertisement, announcement, statement, or representation" be made "to the public." There is no indication in these subsections, or any of the other many and detailed subsections that make up § 100.18, that the legislature intended to add a remedy for common law misrepresentation claims rather than to create a distinct statutory cause of action.

¶ 41. The case Armstrong relies on, *Gorton v. American Cyanamid Co.*, 194 Wis. 2d 203, 232, 533 N.W.2d 746 (1995), does not in any way suggest that Wis. Stat. § 100.18 does not create a cause of action distinct from common law misrepresentation claims. That case simply holds that because, in the course of proving its common law negligent misrepresentation claim at trial, the plaintiff had proven all the elements for a claim under § 100.18, the trial court properly exercised its discretion in amending the pleadings to conform to the proof at trial, thereby allowing the plaintiff post-trial to request attorney fees under § 100.18. The fact that two different claims may be proved with the same evidence in a particular case does not mean they are the same claim. By way of example, in *Grube v. Daun*, 173 Wis. 2d 30, 52–63, 496 N.W.2d 106 (Ct. App. 1992), we separately analyzed the elements of intentional misrepresentation, negligent misrepresentation, strict liability misrepresentation, and § 100.18(1) and concluded that the complaint stated a claim for relief for each of the four claims.

¶ 42. Since we reject the premise of Armstrong's argument—that Wis. Stat. § 100.18 does not create a new cause of action, but simply provides a remedy for common law claims—there is nothing supporting his conclusion that the economic loss doctrine applies to claims under § 100.18. He develops no argument to link

708

the rationale for the economic loss doctrine to the purpose of § 100.18, and we can see none. The legislature has plainly chosen in § 100.18 to provide protection and remedies for false advertising that do not exist at common law. The underpinnings of the economic loss doctrine—protecting parties' freedom to allocate economic risk by contract, encouraging the purchaser to assume, allocate, or insure against that risk, and maintaining the fundamental distinction between tort and contract law—are either irrelevant to, or inconsistent with, that legislative choice.

¶ 43. We conclude the economic loss doctrine does not apply to claims under Wis. Stat. § 100.18. For the reasons we have discussed in the preceding section, we conclude there are genuine issues of material fact whether the documents Armstrong or his agents provided the Kailins or their agents on or before December 9, 1998, contained statements or representations that were misleading. However, with respect to statements or representations made after that date, we conclude they are not in any event covered by § 100.18 because they were not made "to the public." We reach this result because a statement made to the particular party with whom one has contracted is not a statement made to "the public."

¶ 44. We recognize that "the public" in Wis. Stat. § 100.18 does not necessarily mean a large audience, and a statement made to one person may constitute a statement made to "the public" under this statute. *Bonn v. Haubrich*, 123 Wis. 2d 168, 173 n.4, 366 N.W.2d 503 (Ct. App. 1985). However, the important factor in defining "the public" is "whether there is some particular relationship between the parties." *State v.*

*Automatic Merchandisers of Am., Inc.*, 64 Wis. 2d 659, 664, 221 N.W.2d 683 (1974). Once the contract was made, the Kailins were no longer "the public" under the statute because they had a particular relationship with Armstrong—that of a contracting party to buy the real estate that is the subject of his post-contractual representation. The purpose of § 100.18 is aimed at untrue, deceptive, or misleading statements made to induce certain actions. *See Bonn*, 123 Wis. 2d at 173. This purpose is reflected in the alternative requirement that the assertion, representation, or statement of fact be either with intent to sell or with intent to induce the public to enter into a contract or obligation relating to a purchase or sale. Statements made by the seller after a person has made a purchase or entered into a contract to purchase logically do not cause the person to make the purchase or enter into the contract. We see no indication in the language of § 100.18(1) that the legislature intended to address untrue, deceptive, or misleading assertions, representations, or statements of fact made by one party to another after they have entered into a contract.

¶ 45. Therefore, we conclude that the Kailins' claim under WIS. STAT. § 100.18 is limited to representations that were made prior to the acceptance of the offer to purchase and that otherwise meet the requirements of the statute.

*Expert Testimony*

■

¶ 46. Armstrong argues that the Kailins' failure to designate an expert witness is an independent reason to affirm the trial court's dismissal of all their claims. He argued this to the trial court, but the court did not rule on it. Armstrong contends expert testimony is

needed on these issues: (1) whether Armstrong followed the usual customs and practices of the industry in connection with the sale; (2) whether the Kailins exercised proper due diligence; (3) whether the materiality of the information not provided was significant enough to affect the purchase offer; and (4) whether the Kailins had the ability to obtain explicit protection in the sale contract on the issue of rental income. We do not see the relevance of any of these issues to the breach-of-contract claim: we have construed the disputed provision in the contract as a matter of law and the parties' obligations and rights on this claim are governed by the terms of the contract they actually negotiated, not one they might have negotiated. We will assume without deciding that one or more of these four issues is relevant to the Kailins' claim for intentional misrepresentation. However, we are not persuaded that resolution of the claim requires "special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind." *Kujawski v. Arbor View Health Care Ctr.*, 139 Wis. 2d 455, 463, 407 N.W.2d 249 (1987). Therefore, we conclude Armstrong is not entitled to dismissal of any claim on this ground.

## B. Claims Against First Weber and Carpenter

¶ 47. The Kailins argue that the trial court erred in dismissing their claims against First Weber and Carpenter for the same reasons it erred in dismissing their claims against Armstrong for breach of contract, intentional misrepresentation, and violation of Wis. Stat. § 100.18. However, neither First Weber nor Carpenter is a party to the contract and the complaint asserts the contract claim against Armstrong only.

711

Therefore, we confine our analysis to the claims for fraud in the inducement and a violation of § 100.18.

¶ 48. First Weber and Carpenter argue that their duty to disclose is defined by statute, not by common law, WIS. STAT. § 452.139(1), and they did not have a statutory duty to disclose Ring Karate's rent arrearage under WIS. STAT. § 452.133(1)(c), because the rent arrearage is not a material adverse fact as defined in WIS. STAT. § 452.01(5g). The Kailins do not reply to this argument. Therefore, we take it as a concession, *see Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994), and affirm the trial court's dismissal of all claims against First Weber and Carpenter.

## CONCLUSION

¶ 49. We reverse the summary judgment in favor of Armstrong insofar as it dismisses the breach-of-contract claim, the fraud-in-the-inducement claim, and the claim under WIS. STAT. § 100.18 for representations made on or before December 9, 1998, and we remand for further proceedings on those claims. We affirm the summary judgment insofar as it dismisses all other claims against Armstrong and dismisses all claims against First Weber and Carpenter.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.