James B. LINDEN and Dianne C. Linden,
Plaintiffs-Appellants-Petitioners,

v.

CASCADE STONE COMPANY, INC.,
West Bend Mutual Insurance Company
and Rich Fern d/b/a Allied Construction,
Defendants-Respondents,

AMERICAN FAMILY MUTUAL INSURANCE COMPANY,
Intervening Defendant-Respondent.

Supreme Court

*No. 2004AP4. Oral argument March 30, 2005.
—Decided July 8, 2005.*

2005 WI 113

(Also reported in 699 N.W.2d 189.)

608

For the plaintiffs-appellants-petitioners there were briefs by *Mark A. Seidl* and *Seidl & Stingl, S.C.,* Wausau, and oral argument by *Mark A. Seidl.*

For the defendant-respondent, West Bend Mutual Insurance Company, there was a brief by *R. Michael Waterman* and *Mudge Porter Lundeen & Sequin, S.C.,* Hudson, and oral argument by *R. Michael Waterman.*

For the defendant-respondent, Rich Fern d/b/a Allied Construction, there was a brief by *Mark S. Henkel* and *First Law Group, SC,* Stevens Point, and oral argument by *Mark S. Henkel.*

For the intervening defendant-respondent there was a brief by *Paul E. David* and *Wendorff, Ellison & David, LLP,* Wausau.

¶ 1.PATIENCE DRAKE ROGGENSACK, J. James and Dianne Linden seek review of a court of appeals decision affirming the grant of summary judgment that dismissed their negligence and contract claims against Cascade Stone Company, Inc. (Cascade), Rich Fern d/b/a

Allied Construction (Fern) and their insurers for alleged faulty workmanship in the construction of their house. We conclude that summary judgment is appropriate and therefore affirm.

## I. BACKGROUND

¶ 2. On March 24, 1999, James and Dianne Linden entered into a written contract with Groveland Craftsman, Inc. (Groveland), wherein Groveland agreed to construct a new house for the Lindens. Groveland retained various subcontractors to assist in the house's construction. Groveland hired Cascade to apply exterior stucco to the house and Fern to shingle the house's roof.

¶ 3. On June 5, 2000, the Lindens sued Groveland and its insurer, ABC Insurance, alleging breach of contract and warranty stemming from alleged defects in the house and delay in completion of the project. The Lindens also alleged Groveland was negligent. The Lindens' amended complaints added Vetter Windows, Fern, Cascade, and Cascade's insurers, West Bend Mutual and Western National, as defendants, and Fern's insurer, American Family, intervened.[1] The Lindens alleged that Groveland was negligent in allowing water to infiltrate into the house, causing deterioration, mold and deficient air quality in the house. The Lindens alleged that Cascade's negligent stucco application allowed substantial water infiltration, and that Fern provided negligent roofing services that also led to water infiltration.

¶ 4. The circuit court granted summary judgment in favor of Fern and Cascade, holding that the economic loss doctrine barred the Lindens' tort claims against the

---

[1] The Lindens settled with Vetter, Groveland and ABC. The claims against Western were dismissed. We address only the claims against the remaining parties, Cascade and its insurer, West Bend Mutual, and Fern and its insurer, American Family.

subcontractors. The court also concluded that there was no coverage for the contract claim under Cascade's West Bend policy, and denied the Lindens' motion to add a contract claim against Fern.[2] The Lindens appealed, and the court of appeals affirmed. We granted the Lindens' petition for review, limiting the issues to the following: (1) whether a general contract to complete a described project, whereunder the general contractor subcontracts with others to assist in completing the project and a claim is made for negligent services provided by the subcontractors, controls the analysis of whether the contract is primarily for goods or primarily for services; (2) whether an objective test should be used by Wisconsin courts to determine if the predominant purpose of a mixed contract was for the sale of a product or to provide services; and (3) whether the "integrated system limitation" of the "other property exception" to the economic loss doctrine applies to bar a negligence claim against a subcontractor who provided services in the construction of a house.

## II. DISCUSSION

### A. Standard of Review

¶ 5. Whether the trial court properly granted a motion for summary judgment is a question of law we review de novo, valuing the previous courts' analyses.

---

[2] The circuit court also dismissed the contract claim against Cascade. On appeal, the Lindens argued that the court erroneously dismissed this claim, but the court of appeals did not address this argument, noting that Cascade had not been served with notice of the appeal and had not appeared in the appeal.

*Biese v. Parker Coatings, Inc.*, 223 Wis. 2d 18, 21, 588 N.W.2d 312 (Ct. App. 1998). "In determining if the trial court properly granted summary judgment, we apply the same methodology as the trial court." *Id.* at 22. "[S]ummary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citing Wis. Stat. § 802.08(2)). Interpreting the nature of a contract —whether it is primarily one for goods or primarily one for services—presents a question of law subject to independent review. *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶ 14, 276 Wis. 2d 361, 688 N.W.2d 462. Whether the economic loss doctrine bars a claim under a given set of facts is also subject to independent review. *Id.*, ¶ 15.

B. Economic Loss Doctrine

¶ 6. "The economic loss doctrine is a judicially created doctrine under which a purchaser of a product cannot recover from a manufacturer on a tort theory for damages that are solely economic." *Bay Breeze Condo. Ass'n v. Norco Windows, Inc.*, 2002 WI App 205, ¶ 9, 257 Wis. 2d 511, 651 N.W.2d 738 (citing *Kailin v. Armstrong*, 2002 WI App 70, ¶ 27, 252 Wis. 2d 676, 643 N.W.2d 132). Economic damages are those arising because the product does not perform as expected, including damage to the product itself or monetary losses caused by the product. *Biese*, 223 Wis. 2d at 23. Economic damages do not include losses due to personal injury or damage to other property. *Id.*

¶ 7. The economic loss doctrine preserves the distinction between contract and tort law; the doctrine seeks to avoid drowning contract law in "a sea of tort."

*Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis. 2d 395, 403–04, 410, 573 N.W.2d 842 (1998) (citing *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 866 (1986)). In protecting the distinction between tort and contract law, the economic loss doctrine recognizes:

> In contract law, the parties' duties arise from the terms of their particular agreement; the goal is to hold parties to that agreement so that each receives the benefit of his or her bargain. The aim of tort law, in contrast, is to protect people from misfortunes which are unexpected and overwhelming. The law imposes tort duties upon manufacturers to protect society's interest in safety from the physical harm or personal injury which may result from defective products. Thus, where a product fails in its intended use and injures only itself, thereby causing only economic damages to the purchaser, "the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong."

*Wausau Tile, Inc. v. County Concrete Corp.,* 226 Wis. 2d 235, 247–48, 593 N.W.2d 445 (1999) (citations omitted).

C. Predominant Purpose Test

¶ 8. Some contracts encompass both products and services. We use the predominant purpose test to determine whether a mixed contract for products and services is predominantly a sale of a product and therefore subject to the economic loss doctrine, *see Biese,* 223 Wis. 2d at 26, or predominantly a contract for services and therefore not subject to the economic loss doctrine, *see Cease Electric,* 276 Wis. 2d 361, ¶ 52.

¶ 9. The predominant purpose test was developed in the Uniform Commercial Code (UCC) context when

contracts that were alleged to be sales (Wis. Stat. ch. 402) occurred. Because the sales chapter of the UCC applies to transactions in goods, Wis. Stat. § 402.102, and many contracts involved both goods and services, it was necessary to determine which component was predominant. *See Bonebrake v. Cox,* 499 F.2d 951 (8th Cir. 1974).

¶ 10. *Van Sistine v. Tollard,* 95 Wis. 2d 678, 291 N.W.2d 636 (Ct. App. 1980), was the first Wisconsin case to apply the predominant purpose test in order to determine whether a mixed contract was predominantly for goods or for services. In that case, the dispute concerned a contract to install windows, install stucco siding, reposition appliances and perform finishing. The court considered subjective factors, such as the contractor being described as a "siding contractor" and the tasks to be undertaken were described as services such as " 'install', 'reposition,' 'move' and 'finishing.' " The contract did not speak in terms of a sale. *Id.* at 685. The court also considered that more than half of the cost of the project was for labor, with a lesser amount expended for materials. *Id.* Given the totality of services provided, the court concluded that the contract was primarily for services. *Id.*

¶ 11. In *Micro-Managers, Inc. v. Gregory,* 147 Wis. 2d 500, 434 N.W.2d 97 (Ct. App. 1988), the court of appeals again employed the predominant purpose test to determine whether the UCC applied to the transaction. There, Gregory contracted with Micro-Managers to develop software for a programmable controller for manufacturing equipment. The court reasoned that "all . . . charges to Gregory would be on the basis of time, at stated rates, and materials." *Id.* at 508. The contract described time components and tasks to be accomplished, using such words as " 'man-days,' 'devel-

opment,' 'time,' 'design,' etc." *Id.* at 508–09. The court concluded that the words chosen connote the provision of services and not the sale of goods. *Id.* at 509. The court also considered billing evidence, and concluded that $55,968 of the $59,828 total bill was for services. *Id.* at 508. After considering the totality of services, the court concluded that the contract was predominantly for services. *Id.* at 509.

D. Which Contract Controls

¶ 12. Before we employ the predominant purpose test, we must determine which contract controls, the general contract between the Lindens and Groveland, or the subcontracts between Groveland and Cascade and Fern. The Lindens argue that we should examine the subcontracts that are predominantly for services, which exempts them from the economic loss doctrine. Cascade and Fern argue the general contract is the controlling contract here, and it is a contract for a product, the finished house.

¶ 13. The Lindens cite three cases for the proposition that the subcontracts rather than the general contract should be the contracts to which the predominant purpose test is applied. However, those cases do not provide clear support for their position. They first cite *Biese.* In that case, Biese owned a sports bar and hired A to Z Epoxy Coatings to install an epoxy floor in the bar. *Biese,* 223 Wis. 2d at 20. Parker Coatings supplied A to Z with the flooring materials. Biese had problems with the floor and eventually sued Parker for negligence. The court held that Parker provided both goods and services, but that the underlying transaction between Biese and Parker was predominantly for a product. *Id.* at 28–29. Based on *Biese,* the Lindens argue that we should examine the subcontracts in this

case. We do not read *Biese* so broadly. The relevant transaction was not disputed by the parties in *Biese,* and the decision is unclear because while the court looked at the "transaction between Parker and Biese," it also stated that the "entire underlying transaction" was at issue. *Id.* at 27. Accordingly, we conclude *Biese* is not a guide for deciding which contract controls.

¶ 14. The Lindens also cite *Cease Electric,* where a chicken farmer bought a ventilation system for a barn and hired Cease Electric to wire the system's components. *Cease Elec.,* 276 Wis. 2d 361, ¶¶ 3, 7. After the system failed, the farmer sued Cease. We concluded that Cease contracted to provide services, with goods being incidental. *Id.,* ¶ 18. *Cease Electric* is inapposite to the current discussion because there are two separate contracts here, while Cease was the sole contractor that the farmer hired to wire the components of a ventilation system the farmer provided. There was no contract-subcontract situation as we have here.

¶ 15. Finally, the Lindens cite *Hap's Aerial Enterprises, Inc. v. General Aviation Corp.,* 173 Wis. 2d 459, 496 N.W.2d 680 (Ct. App. 1992), where a buyer of an aircraft was allowed to sue a third party in tort for a negligent inspection the seller hired the third party to perform. *Hap's Aerial* is different factually from the subcontractor situation presented by the case at bar, as the inspection in *Hap's Aerial* was not tied to the sale of the plane, unlike the situation before us, where the subcontract is part of the relevant transaction, the construction of the Lindens' house.

¶ 16. All parties argue that the policies behind the economic loss doctrine are furthered by their positions. The policies behind the economic loss doctrine are: (1) to maintain the "fundamental distinction between tort

law and contract law"; (2) to protect the "parties' freedom to allocate economic risk by contract"; and (3) to encourage the purchaser, as the "party best situated to assess the risk of economic loss, to assume, allocate, or insure against that risk." *Wausau Tile,* 226 Wis. 2d at 247. After considering these policies, we conclude they are best furthered by examining the general contract rather than the subcontracts.

¶ 17. Cascade and Fern argue that examining the service subcontracts rather than the Lindens' contract with the general contractor, Groveland, would allow the Lindens to make an end run around the contract for which Groveland and the Lindens bargained. We agree. Focusing on the contract for which the purchaser bargained maintains the distinction between tort and contract for the purchaser who is in the best position to bargain for coverage of the risk of faulty workmanship in any part of the house. The Lindens did exactly that here. They had contractual remedies against Groveland, who in turn had its own remedies against the subcontractors. We also agree with the court of appeals reasoning that "[a]t its core, the Lindens' complaint is that the house they received is not the house for which they contracted." Allowing the Lindens to maintain a tort claim against the subcontractors for services rendered to the general contractor would undermine the distinction between contract law and tort law that the economic loss doctrine seeks to preserve. We also conclude that allowing the Lindens to maintain a tort action against the subcontractors harms the Lindens' and Groveland's freedom of contract, because permitting the Lindens to maintain a tort claim would get around the warranties and remedies they had already bargained for with Groveland. Because we conclude that according the general contract control over this

transaction better meets the policies underlying the economic loss doctrine, we apply the predominant purpose test to the contract between the Lindens and Groveland.

E. Predominant Purpose Test: Objective/Subjective Factors

¶ 18. The Lindens argue that we should adopt a rebuttable presumption in favor of the use of a quantitatively objective test when determining the predominant purpose of a mixed contract. Application of the test the Lindens suggest would require totaling the costs of the project associated with materials and comparing it to the total cost of labor, in order to determine which contract component cost the most. The Lindens contend that (1) there is a need to select a given type of test because courts that have used both objective and subjective tests in previous applications of the predominant purpose test have rendered confusing decisions; and (2) adopting a quantitatively objective test would make court decisions consistent and predictable. The Lindens make good arguments, but we conclude that the totality of the circumstances test, which includes both quantitatively objective and subjective factors, should be applied to determine the predominant purpose of a contract.

¶ 19. Prior cases give guidance on how to employ the predominant purpose test. Three reported Wisconsin cases have applied the test; but only *Biese* has applied it in a context where the economic loss doctrine was raised as a defense. As we explained above, the court concluded that although both goods and services were involved, the transaction was predominantly for goods. The court focused on the purpose for which the

parties entered into the contract: "[Biese's] claim is that he did not get what he bargained for, either at the time of the original installation or at reinstallation. . . . Biese contracted with Epoxy for the floor and received a one-year warranty." *Id.* at 28, 30.

¶ 20. In *Van Sistine,* the court reviewed a contract to do home remodeling to determine whether it was predominantly for goods or predominantly for services. In concluding it was predominantly for services, it considered the following objective and subjective factors: the amount charged for services and the amount charged for materials, whether the purpose or "thrust" of the contract was for goods or for services and the language used in the contract to describe the project. *Van Sistine,* 95 Wis. 2d at 684–85.

¶ 21. The Lindens cite no authority concluding that a rebuttable presumption based on quantitatively objective factors has merit. The cases they cite do not rely on quantitatively objective factors to the exclusion of subjective evidence. Rather, the *Bonebrake* predominant purpose test that relies on both quantitative and subjective factors is used widely throughout the country. Specific factors used by courts include the language of the contract, the nature of the business of the supplier, the intrinsic worth of the materials, *Princess Cruises, Inc. v. General Electric Co.,* 143 F.3d 828, 833 (4th Cir. 1998), the circumstances of the parties, and the primary objective they hoped to achieve by entering into the contract, *Insul-Mark Midwest, Inc. v. Modern Materials, Inc.,* 612 N.E.2d 550, 555 (Ind. 1993). *See also, e.g., BMC Indus., Inc. v. Barth Indus., Inc.,* 160 F.3d 1322 (11th Cir. 1998); *Colo. Carpet Installation, Inc. v. Palermo,* 668 P.2d 1384 (Col. 1983); *In re Trailer & Plumbing Supplies,* 578 A.2d 343 (N.H. 1990).

¶ 22. While we agree with the Lindens that reliance on quantitatively objective factors would make courts' applications of the predominant purpose test predictable, in that courts would rely on nothing more than the bills submitted by the parties, we disagree that relying solely on quantitative factors to the exclusion of subjective factors would make applications more consistent, or for that matter, more fair or accurate. In Wisconsin and throughout other jurisdictions, a majority of courts examine all the factors before them, both objective and subjective, to determine the predominant purpose of a contract. We agree with that approach and conclude considering the totality of the circumstances presented will give the most complete picture of the transaction at issue.

F. The General Contract

¶ 23. In the present case, consideration of quantitatively objective factors is difficult because the general contract does not provide all of the costs broken down into services and materials. There are significant materials costs. For example, the lumber cost is almost $100,000 of the roughly $360,000 total cost of the house, but other items listed in the contract use language that mixes materials and services, making it impossible to separate the cost of the materials from the cost of the services, e.g., "roofing labor and installation cost."

¶ 24. Turning to the subjective language of the agreement, the contract is couched both in terms of service words and product words. For example, it lists services to be provided such as "[p]rovide excavation," "drain tile installed," and "spray mastic waterproofing applied," and it describes the finished product that is

621

being sold to the Lindens, such as "[e]xterior finish to be stucco and brick," and "[r]oof system to be manufactured trusses."

¶ 25. While there is a mixture of service and product words in the contract, after examining the entire document and considering the purpose for which the contract was made, we conclude that the primary reason the Lindens entered into the contract was to have a house custom built for them. The contract begins by outlining the specifications of the project: "Construct a new two story home, with 1768 sq. ft. finished on the first story, 1176 sq. ft. finished on the second story, and 1768 sq. ft. unfinished on the lower walkout level, with a 984 sq. ft. garage." Also, the project's cost was billed using a "fixed price contract," not changing based on the hours worked,[3] but only on changes in the specifications. The contract stated: "Any change to specifications that lower cost of project, will be a reduction in cost to client, and any change in specifications that result in a higher cost, will be charged to client." This shows that the parties bargained for costs based on the specifications of the house, not the amount of work put into completion of the project. Based on our application of quantitative and subjective factors, we conclude that under the totality of circumstances, the predominant purpose of the contract was for a product, a new house, rather than one for services.

---

[3] There was a provision for a penalty against Groveland of $100 per working day for each day over twenty-six weeks spent on the project and a corresponding bonus of $100 per day to the contractor for early completion, but these amounts are not based on the value of Groveland's services for a day of work.

## G. Integrated Systems Limitation

■

¶ 26. The final issue we consider is whether the integrated systems limitation of the "other property" exception to the economic loss doctrine applies to cases where the defective "component" at issue is predominantly services provided by a subcontractor in a mixed contract. We conclude that it does.

¶ 27. As we explained in *Wausau Tile,* 226 Wis. 2d at 249, "[d]amage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property' [that would preclude] the application of the economic loss doctrine." In that case, Wausau Tile manufactured concrete paving blocks made of cement, aggregate, water and other materials for use primarily on exterior sidewalks. *Id.* at 241. Wausau Tile sued the company it hired to supply the cement for its paving blocks, alleging that high levels of alkalinity in the cement caused problems with the paving blocks, such as excessive expansion and cracking. *Id.* at 242. Wausau Tile argued on appeal that the cost of repairing and replacing the paving blocks did not constitute economic loss because the paving blocks themselves were "property other than the defective product [the cement]." *Id.* at 249. We rejected Wausau Tile's argument and explained:

> "A product that fails to function and causes harm to surrounding property has clearly caused harm to other property. However, when a component part of a machine or a system destroys the rest of the machine or system, the characterization process becomes more difficult. When the product or system is deemed to be an integrated whole, courts treat such damage as harm to the product itself. When so characterized, the dam-

age is excluded from the coverage of [the Restatement of Torts]. A contrary holding would require a finding of property damage in virtually every case in which a product harms itself and would prevent contractual rules from serving their legitimate function in governing commercial transactions."

*Id.* at 249–50 (quoting Restatement (Third) of Torts § 21 cmt. e (1997)). We concluded that the paving blocks were "integrated systems comprised of several component materials, including . . . cement." *Id.* at 251.

¶ 28. The court of appeals also applied the integrated systems exception to a building in *Bay Breeze.* In that case, defective windows installed in a condominium development led to water leakage into the units that damaged the buildings. *Bay Breeze,* 257 Wis. 2d 511, ¶ 5. The court adopted reasoning from *Casa Clara Condominium Ass'n, Inc. v. Charley Toppino & Sons, Inc.,* 620 So. 2d 1244 (Fla. 1993), where condominium units and single-family homes were damaged by defective concrete supplied by the defendants:

"Generally, house buyers have little or no interest in how or where the individual components of a house are obtained. They are content to let the builder produce the finished product, i.e., a house. These homeowners bought finished products—dwellings—not the individual components of those dwellings. They bargained for the finished products, not their various components. The concrete became an integral part of the finished product and, thus, did not injure 'other' property."

*Bay Breeze,* 257 Wis. 2d 511, ¶ 25 (quoting *Casa Clara,* 620 So. 2d at 1247). The court concluded:

We adopt the reasoning of *Casa Clara* as the law in Wisconsin. We hold that the economic loss doctrine

applies to building construction defects when, as here, the defective product is a component part of an integrated structure or finished product. The law of *Casa Clara* is consistent with Wisconsin precedent addressing component parts that cause damage to an integrated product, which results in only economic loss.

Here, as in *Casa Clara,* the homeowners purchased a finished product, their condominium units, the quality of which fell below expectations. While the Association argues that the defective windows caused damage to interior and exterior walls and casements, these are but other component parts in a finished product. Because of the integral relationship between the windows, the casements and the surrounding walls, the windows are simply a part of a single system or structure, having no function apart from the buildings for which they were manufactured. Although the condominium units may have suffered incidental damage as a result of the failed windows, this does not take a commercial dispute outside the economic loss doctrine.

*Bay Breeze,* 257 Wis. 2d 511, ¶¶ 26–27 (citations omitted). The reasoning of *Bay Breeze* and *Casa Clara* applies here. The stucco and roof shingling have no independent value or use apart from their function as components of the house. The Lindens bargained for the finished product, a house; not its various components.

¶ 29. The Lindens cite to *Jacob v. Russo Builders,* 224 Wis. 2d 436, 592 N.W.2d 271 (Ct. App. 1999), an insurance case involving the interpretation of a business risk exclusion in a general liability policy, for the proposition that Wisconsin courts have already rejected the argument that negligently provided services could fall within the integrated systems exception. *Jacob* provides no support for this assertion because it expressly rejected reliance on cases involving the eco-

nomic loss doctrine. *Id.* at 453. The court explained that economic loss cases did not assist it in determining how a reasonable insured would understand the insurance policy language that was at issue. *Id.; see also Bay Breeze,* 257 Wis. 2d 511, ¶ 23 n.5. Because the damage caused by the defective stucco and roof shingling harmed only other components of the house, we conclude the integrated systems exception applies, and the Lindens are therefore barred from seeking tort remedies from the subcontractors.

¶ 30. The dissent incorrectly claims that because of our conclusion barring a homeowner from suing a subcontractor for economic loss under tort law, Wisconsin homeowners "will be frustrated at every turn," unable to pursue either contract or tort claims against subcontractors. Dissent, ¶ 3. The dissent greatly overstates our holding's limitation on suits brought by homeowners. As we explain above, homeowners retain contractual remedies against the general contractors, who in turn have their own remedies against the subcontractors.

¶ 31. Additionally, we have never addressed whether a third-party beneficiary action by a homeowner could lie against a subcontractor, and if so, under what circumstances it would be appropriate. In some jurisdictions when a general contractor is insolvent, courts have permitted contract actions against the subcontractors under a third-party beneficiary theory.[4]

---

[4] *See Syndoulos Lutheran Church v. A.R.C. Indus., Inc.,* 662 P.2d 109, 114 (Alaska 1983) (concluding that owner had a claim for relief as a third-party beneficiary against subcontractor); *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.,* 336 A.2d 211 (Del. 1975) (concluding that contract between general contractor and subcontractor made owner of premises a third-party creditor beneficiary thereof); *People ex rel. Resnik v. Curtis &*

Some of the jurisdictions that permit claims by a homeowner against a subcontractor do so because "the subcontractor has agreed to perform an obligation that the [general] contractor owes to the owner." Melvin Aron Eisenberg, *Third-Party Beneficiaries*, 92 Colum. L. Rev. 1358, 1403 (1992).[5] In Wisconsin, a third-party action is not a new theory of recovery. For example, in *Auric v. Continental Casualty Co.*, 111 Wis. 2d 507, 331 N.W.2d 325 (1983), we addressed whether privity of contract was necessary in order to sue an attorney who had not had a will properly executed. Although the words "third-party" do not appear in the opinion, we said that the beneficiary of a will did not need privity to sue the drafting attorney because it was "clear that this will was intended to bring direct benefit to the plaintiff." *Id.* at 514. However, because the Lindens did not present their contract claim for our review, we take no position on whether such a claim could be maintained.

## III. CONCLUSION

¶ 32. We conclude that when one contracts with a general contractor to build a house and the general

*Davis, Architects & Planners, Inc.*, 400 N.E.2d 918, 920 (Ill. 1980) (concluding that state was a third-party beneficiary of contract between Illinois Building Authority and several architects and contractors for the construction of a prison).

[5] Melvin Aron Eisenberg, *Third-Party Beneficiaries*, 92 Colum. L. Rev. 1358, 1403 (1992), thoroughly discusses the occasions to employ third-party contract actions. The development of the economic loss doctrine is one of the areas where third-party actions are becoming more common. *Id.* (citing *Sears, Roebuck & Co. v. Jardel Co.*, 421 F.2d 1048, 1054 (3d Cir. 1970); *United States v. Ogden Tech. Lab., Inc.*, 406 F. Supp. 1090, 1092–93 (E.D.N.Y. 1973); *Gilbert Fin. Corp. v. Steelform Contracting Co.*, 145 Cal. Rptr. 448, 451 (Cal. Ct. App. 1971)).

contractor subcontracts with others to provide various services, the general contract controls whether the economic loss doctrine is available as a defense. We also conclude that courts should consider the totality of the circumstances, which includes both objective and subjective factors, in determining the predominant purpose of a mixed contract. And finally, we conclude that the integrated system limitation of the other property exception to the economic loss doctrine is applicable where the subcontractor mainly provided services that have no independent value or use apart from their function as components of the product into which they were incorporated. In the present case, we conclude that the general contract between the Lindens and Groveland was primarily for a product, and that the integrated systems limitation applies to the damages caused by Cascade and Fern. Accordingly, we conclude the court of appeals properly affirmed summary judgment dismissing the claims.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 33. ANN WALSH BRADLEY, J. (*dissenting*). The unfortunate result of the majority opinion today is the limitation of legal rights for all homeowners in Wisconsin.

¶ 34. Prior to this decision, a homeowner generally could not sue a subcontractor under contract law for economic loss because of a lack of contract between them.[1] For years in this state, however, a homeowner could bring a direct claim in negligence against the

---

[1] Unless there is privity of contract, generally there is no liability for breach of contract to outsiders. *Prinsen v. Russos,* 194 Wis. 142, 145, 215 N.W. 905 (1927).

subcontractor for damages sustained from faulty workmanship.[2]

¶ 35. Now, following this decision, a homeowner is likewise barred from suing a subcontractor under tort law for economic loss. Thus, an aggrieved homeowner seeking to pursue a direct remedy for wrongs caused by a subcontractor, will be frustrated at every turn. Because the majority opinion expands the economic loss doctrine well beyond its intended purposes, limits the rights of homeowners, and encourages needless litigation, I respectfully dissent.

I

¶ 36. Although the facts in this case generally can be described as routine, the majority's resolution of the parties' dispute is far from routine. The majority uses one party's contract to bar the tort claims of another with whom there was no contract. It concludes that "when one contracts with a general contractor to build a house and the general contractor subcontracts with others to provide various services, the general contract controls whether the economic loss doctrine is available as a defense." Majority op., ¶ 32. Accordingly, the majority uses the Lindens' contract with Groveland to bar the Lindens' tort claims against Cascade and Fern.

¶ 37. Through its decision, the majority effectively constructs an impenetrable wall between homeowners and subcontractors. Homeowners cannot di-

---

[2] *See, e.g., Jacob v. Russo Builders,* 224 Wis. 2d 436, 592 N.W.2d 271 (Ct. App. 1999) (owners of a newly built house sued the general contractor, the masonry subcontractor, and the subcontractor's comprehensive general liability insurer for damages arising from the subcontractor's faulty work).

rectly sue the subcontractor for economic loss in either contract or tort. Instead of being able to sue the subcontractor directly, the majority now requires a general contractor to stand in as a middleman for purposes of liability. This new arrangement is required, the majority insists, because of the economic loss doctrine. I conclude that the majority has once again expanded the economic loss doctrine well beyond its principled origins of products liability. When subjected to the lens of reality, the policy considerations underlying the doctrine do not support its application here.

## II

¶ 38. As noted by the majority, the economic loss doctrine is a judicially created doctrine that seeks to preserve the distinction between contract and tort. *Id.,* ¶ 6. From its beginning, the doctrine "has been based on the understanding that contract law, and particularly the law of warranty, is better suited than tort law for dealing with purely economic loss in the commercial arena." *Insurance Co. of N. America v. Cease Electric Inc.,* 2004 WI 139, ¶ 15, 276 Wis. 2d 361, 688 N.W.2d 462.

¶ 39. Wisconsin first recognized the economic loss doctrine in *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.,* 148 Wis. 2d 910, 437 N.W.2d 213 (1989). We held, in the context of a products liability case, that "a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories, particularly . . . where the warranty given by the manufacturer specifically precludes the recovery of such damages." *Id.* at 921.

¶ 40. Three policies serve as a basis for the doctrine's application: "(1) to maintain the fundamen-

tal distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk of economic loss to assume, allocate, or insure against that risk." *Cease Electric,* 276 Wis. 2d 361, ¶ 38. I cannot agree with the majority's conclusion that these policies support the result reached here.

## A

¶ 41. The majority concludes that the first policy of maintaining the distinction between tort and contract law is furthered by focusing on "the contract for which the purchaser bargained." Majority op., ¶ 17. But where does the risk of blurring that distinction between contract and tort arise when there is no contract with the alleged tortfeasor?

¶ 42. Allowing the Lindens to maintain tort claims against Cascade and Fern would not allow them to make an "end run" around their contract. Indeed, the Lindens brought their tort action against Cascade and Fern precisely because there was no contract between them and therefore no contractual remedies were available to them.

¶ 43. In this case, there was no provision in the Groveland general contract prohibiting the Lindens from pursuing negligence claims against these subcontractors. By now using that contract to preclude the Lindens' tort actions, the majority has effectively rewritten its terms. Such a result does nothing to maintain a distinction between tort and contract law. Rather, it serves only to further blur the line.

631

B

¶ 44. In examining the second policy of protecting the "commercial parties' freedom to allocate economic risk by contract," the majority ignores the fact that the Lindens are not commercial parties. It warns that allowing the Lindens' tort action against the subcontractors would "get around the warranties and remedies they had already bargained for" with the general contractor. *Id.*

¶ 45. Apparently, the majority believes that the Lindens were free to anticipate the risks with the subcontractors, allocate those risks, and bargain accordingly. This reasoning can best be described as "long on philosophy but short on reality." *State v. Reed,* 2005 WI 53, ¶ 75, 280 Wis.2d 68, 695 N.W.2d 315 (Prosser, J., concurring).

¶ 46. The majority would have us pretend that all home contracting jobs, regardless of the size, should be handled like sophisticated commercial transactions. What happens when a homeowner wants a new deck added to the cottage and hires a local carpenter, who in turn will get local subcontractors to do the electrical, painting, and landscaping?

¶ 47. Before engaging in the negotiations regarding the allocation of risk, the carpenter and the homeowner should first determine what risks they are allocating. Is the carpenter providing a product (a new deck) or is it a service? In answering this question, the homeowner and carpenter should apply the predominant purpose test. According to the majority, they should consider both "quantitatively objective and subjective factors." Majority op., ¶ 18. They must analyze whether the work performed by the local subcontractors is subject to the "integrated systems limitation of

632

the 'other property' exception to the economic loss doctrine." *Id.*, ¶ 26. This kind of negotiation may be part of the reality of the majority's world, but I submit it is not part of the reality of many homeowners in this state.

¶ 48. In theory, if homeowners want to protect themselves against the possibility that the general contractor may be financially unable to remedy shoddy work done by the subcontractors, they can seek to obtain contract warranties directly from each subcontractor. In practice, however, this approach is problematic because homeowners often do not know beforehand with whom the general contractor will be subcontracting. They may not be able to find out this information because general contractors themselves may not yet know.

¶ 49. Thus, in the present case, the Lindens had no opportunity to negotiate with the subcontractors and allocate risk accordingly. Nevertheless, the majority would have the Lindens negotiate with the general contractor for contingencies that might arise involving the unknown subcontractors. In reality, homeowners likely will fail to allocate risk for an unanticipated eventuality and will be limited by this decision to recovery based on what they managed to anticipate.

C

¶ 50. The final policy reason on which the majority rests its decision is that the economic loss doctrine views the purchaser as the "party best situated to assess the risk of economic loss, to assume, allocate, or insure against that risk." *Id.*, ¶ 16. The Lindens, it is asserted, were in the best position to anticipate "the risk of faulty workmanship" and thus were in the best position to "bargain for coverage" of that risk. *Id.*, ¶ 17.

¶ 51. But is a homeowner truly the "party best situated" to predict and prevent the risk of a subcontractor's sub-standard work? Is it not, in fact, subcontractors who can best anticipate and control the quality of their own work?

¶ 52. In reality, the homeowner is little more than the "party best situated" to be damaged by shoddy workmanship. The majority seems to believe that the Lindens, as the party that faced the greatest risk, should have accounted for that risk in their bargaining with the general contractor. But applying the economic loss doctrine on the assumption that they did account for that risk, of course, begs the very question.

### III

¶ 53. Although limiting the rights of homeowners in this state, the majority sees nothing burdensome with such a result. It notes that "[The Lindens] had contractual remedies against Groveland, who in turn had its own remedies against the subcontractors." *Id.* This conclusion casts a world of grays in black and white.

¶ 54. One can easily imagine scenarios where a homeowner does not wish to sue a general contractor. Maybe the contractor is a relative or a family friend. Perhaps the homeowners are generally satisfied with the work of the contractor and do not wish to subject an innocent contractor to a bitter legal dispute. Yet the majority insists that a potentially innocent third party, the contractor, be brought into litigation as a middle-man, all in the name of the economic loss doctrine. It is not good public policy to require that suit be brought against an innocent party or someone you do not want to sue in order to get at the person responsible for the

damages. Such an approach encourages needless litigation and discourages settlement.

¶ 55. Ironically, it was the Lindens' settlement with the contractor Groveland that proved to be their greatest mistake here. Because they settled with the one party who, according to the majority, could sue the allegedly negligent subcontractors, the Lindens will not be made whole. In fact, when pressed by this court at oral argument, counsel for Fern conceded that his client had not yet paid anything to anybody. I conclude that discouraging settlement and promoting needless litigation furthers no worthwhile policy goal.

¶ 56. Finally, the majority attempts to assuage readers' fears by suggesting that homeowners may potentially enforce contracts between general contractors and subcontractors as third-party beneficiaries of those contracts. *Id.,* ¶ 31. Although it is true that a third-party beneficiary action is not a new theory of recovery in Wisconsin, we have never extended it to a context such as this. Indeed, the majority acknowledges as much, noting that this court has "never addressed whether a third-party beneficiary action by a homeowner could lie against a subcontractor, and if so, under what circumstances it would be appropriate." *Id.*

¶ 57. The majority cites an article for the proposition that some jurisdictions permit claims by a homeowner against a subcontractor because "the subcontractor has agreed to perform an obligation that the [general] contractor owes to the owner." *Id.* (citing Melvin Aron Eisenberg, *Third-Party Beneficiaries,* 92 Colum. L. Rev. 1358, 1403 (1992)). However, the sentence upon which the majority relies is taken from a paragraph rejecting that very premise. Although the jurisdictions are split, the article explains the "better view":

It might be argued that an owner is a creditor beneficiary of the contract between the prime contractor and the subcontractor, on the theory that *the subcontractor has agreed to perform an obligation that the prime contractor owes to the owner.* Although the question is certainly not free from doubt, the better view seems to be that taken by Corbin: [C]ontracts between a principal building contractor and subcontractors . . . are made to enable the principal contractor to perform; and their performance by the subcontractor does not in itself discharge the principal contractor's duty to the owner with whom he has contracted. The installation of plumbing fixtures or the construction of cement floors by a subcontractor is not a discharge of the principal contractor's duty to the owner to deliver a finished building containing those items . . . . The owner is . . . [therefore not] a creditor beneficiary . . . .

Eisenberg at 1403–04 (citing 4 *Corbin on Contracts,* § 779D, at 46–47) (emphasis added).

¶ 58. Corbin's position that the homeowner is not a third-party beneficiary is supported by the Restatement (Second) of Contracts § 302 (1981). The discussion, through an illustration, concludes that the owner is only an "incidental beneficiary" of the general contractor's agreement with the subcontractor—not a third-party beneficiary.[3]

¶ 59. This discussion of an "incidental beneficiary" is consistent with the current law of Wisconsin: "A third party cannot maintain an action as a third party beneficiary if under the contract his

---

[3] Illustration 19 from the Restatement (Second) of Contracts § 302 (1981) states an example of an incidental beneficiary: "A contracts to erect a building for C. B then contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's promise, and B is an incidental beneficiary of C's promise to pay A for the building."

was only an 'indirect benefit, merely incidental to the contract between the parties.' " *Pappas v. Jack O.A. Nelson Agency, Inc.*, 81 Wis. 2d 363, 370, 260 N.W.2d 721 (1978) (quoting *Schell v. Knickelbein*, 77 Wis. 2d 344, 348–49, 252 N.W.2d 921 (1977)).

¶ 60. Apparently, feeling some unease with the consequences of its decision, the majority would now have us recognize a new contract theory of recovery in this context. Although the circuit court here dismissed the Lindens' contract action, the majority nevertheless suggests that the Lindens could pursue a contract action as a third-party beneficiary.

¶ 61. Given that the homeowner now can pursue neither a traditional tort action nor a traditional contract action, I invite in this context the new theory of recovery advanced by the majority. When the issue of whether a homeowner can maintain a third-party beneficiary action against a subcontractor is presented, the majority's commitment to providing such a remedy can be assessed. We will then be able to determine whether its discussion here is more than an illusory remedy designed to make the majority's position appear more palatable.

## IV

¶ 62. In the end, the majority's decision excises subcontractors from the pool of those who would face tort liability and places them safely behind the wall of the economic loss doctrine. Homeowners who were previously without contract remedies against subcontractors have now lost their direct tort claims for economic loss as well.

¶ 63. Those dedicated to the unfettered expansion of the economic loss doctrine warn of contract law "drowning in a sea of tort." Indeed, that has become

their mantra. Yet, they are blind to the excesses of their fervor that results, like here, in tort jurisprudence "drowning in a sea of contract." The law is to develop incrementally. Yet, this recently created judicial doctrine has devoured generations of common law.

¶ 64. Some courts have declined to adopt the economic loss doctrine.[4] Others, once advocating its expansion are now signaling a retreat. The Florida Supreme Court, for example, readily acknowledged that it has gone too far beyond the doctrine's original purpose. It stated, "[u]nfortunately . . . our subsequent holdings have appeared to expand the rule beyond its principled origins and have contributed to applications of the rule . . . to situations well beyond our original intent." *Moransais v. Heathman,* 744 So. 2d 973, 980 (Fla. 1999).

¶ 65. Perhaps a day will come when this court will rein in this recent evolution of the economic loss doctrine and "return to the doctrine's principled roots."[5] Perhaps a day will come when this court, like the Florida Supreme Court, will realize that its holdings "have contributed to applications of the rule . . . to situations well beyond our original intent." *Id.* Unfortunately for homeowners of this state, that day is not today.

¶ 66. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice LOUIS B. BUTLER, JR. join this dissent.

---

[4] *See, e.g., Blagg v. Fred Hunt Co.,* 612 S.W.2d 321 (Ark. 1981); *Jim's Excavating Service, Inc. v. HKM Associates,* 878 P.2d 248 (Mont. 1994).

[5] R. Thomas Cane & Sheila Sullivan, *The Future of the Economic Loss Doctrine in Wisconsin,* 78 Wisconsin Lawyer 5, 63 (May 2005).