Federal Insurance Company and The Brewery Works, Inc., Plaintiffs-Appellants,
v.
Grunau Project Development, Inc., SCS of Wisconsin, Arnold & O'Sheridan and Central States Construction Management, Inc., Defendants-Respondents.
No. 2005AP267.
Court of Appeals of Wisconsin, District I.
June 6, 2006.
Before Wedemeyer, P.J., Fine and Kessler, JJ.
¶1 WEDEMEYER, P.J.
Federal Insurance Company and The Brewery Works, Inc. appeal from judgments entered after the trial court granted summary judgment in favor of Grunau Project Development, Inc., SCS of Wisconsin, Arnold & O'Sheridan and Central States Construction Management, Inc. Federal and Brewery Works claim the trial court erred in granting summary judgment for the following reasons: (1) the trial court's determination that oral contracts did not exist was erroneous or at least presented an issue of material fact; (2) even if the sham affidavit rule applies to this case, other evidence creates an issue of material fact; (3) the trial court erred in concluding that Brewery Works accepted the terms of the proposed, but unsigned, standard industry written contract; (4) the economic loss doctrine does not apply because the contract was for services and/or the damage to other property exception applies; and (5) the trial court erred in ruling that Wisconsin does not recognize implied warranties in construction contracts. Because we resolve each contention in favor of upholding the judgments, we affirm.

BACKGROUND
¶2 Brewery Works owns most of Schlitz Park. Gary Grunau, who also owns Grunau Project Development, and Scott Sampson, who also owns T-3 (an architectural firm), also are partial owners of Schlitz Park. Brewery Works needed to completely renovate an old bottling house in Schlitz Park, which had most recently been used as commercial office space by Time Warner Cable. A new tenant, Fortis Health, was moving into the building.
¶3 Samuel Denny was the treasurer and assistant secretary of Brewery Works. Denny was also the person who negotiated and entered into contracts on behalf of Brewery Works. In early 2001, Denny hired T-3 to be the architect for the project. T-3, in turn, contracted with Arnold & O'Sheridan to perform structural engineering services for the renovation project. At the same time, Denny hired Grunau Project as the general contractor for the project and authorized it, without restriction, to hire subcontractors. Brewery Works had a long history of using Grunau Project as its construction manager for renovation and construction projects. Grunau Project contracted with SCS and Central States.
¶4 The principal contract governing the project, often called the "prime contract" was between Brewery Works and Grunau Project. It was an AIA A111-1997 Standard Form of Agreement between owner and contractor. This contract was dated June 1, 2001, and incorporated by reference the terms contained in an ancillary document titled AIA A201-1997 General Conditions of the Contract for Construction. The A201 required Brewery Works, as the owner, to obtain appropriate all-risk insurance for the project. Brewery Works complied with this provision by obtaining insurance from Federal. The contract contained the standard waiver of subrogation rights provision. The A201 stated that Brewery Works' sole recourse in the event of a covered loss was against its own insurance carrier. Grunau prepared and signed the contract and submitted it to Denny. Denny did not immediately sign the contract. It was Denny's apparent practice to allow work to occur without signing the contract. Consistent with this practice, the document involved here remained on his desk for weeks as the project progressed.
¶5 Grunau Project, in turn, contracted with SCS and Central States, among others, to perform renovation work. Each of these contracts contained a waiver of the subrogation clause, which was prevalent in the construction industry. The subcontractor contracts also referenced the "prime contract," stated that it was available for inspection, that Brewery Works had obtained "all-risk" insurance to cover the project and that the owner, contractor and subcontractors all agreed to waive any claims against each other for such covered losses.
¶6 Brewery Works also entered into a written contract with T-3, which was the American Institute of Architects Standard Form Agreement Between Owner and Architect. This contract was proposed by Brewery Works, modified by Denny with the assistance of Brewery Works' attorney, and delivered by messenger to T-3 on September 27, 2001, for execution. This contract also contained a waiver of subrogation clause, whereby the parties mutually agreed that they would not seek recourse from the other in the event of damage to the project. Although many revisions were made to this contract before finalization, the waiver of subrogation clause was never modified.[1]
¶7 Work commenced in May/June 2001, and was supposed to be completed by December 2001. During this time, Grunau Project submitted applications for payment on standard AIA form documents; Brewery Works made progress payments to Grunau Project for the work being performed on the project, as required by AIA A111, Article 12; Grunau Project supervised, directed and coordinated the work on the project as required by AIA A201, Article 3.3.1; and the parties submitted and approved change orders under the contract, specifically referencing the existence of the standard form agreement between Brewery Works and Grunau Project. Denny signed and authorized change orders for work done by Grunau Project and the subcontractors, which specifically referred to the existence of an agreement between Brewery Works and Grunau Project for the renovation.
¶8 In other words, the work on the project was proceeding exactly according to the standard industry contracts, with all parties acting as if the written AIA A111 contract governed the renovation, until September 29, 2001. It was on that date that a load-bearing wall was demolished which, in turn, caused a partial collapse of the building. The collapse resulted in $900,000 worth of damage. The claim for the damage was submitted to Brewery Works' "all-risk" insurer, Federal, who processed and paid the claim. During the adjustment of the claim, Federal asked Brewery Works to sign a statement to the effect that there never was an AIA contract between Brewery Works and Grunau Project. Denny signed a statement dated November 5, 2001, which in relevant part provided:
Although the negotiations had been initiated, at no time did I or, to the best of my knowledge, any authorized representative of The Brewery Works, Inc., execute a written agreement, or come to a meeting of the minds, with Grunau Project Development concerning the terms and conditions for the renovation and remodeling work to be performed at this location except that Grunau Project Development would perform and be paid for the work.
This statement in no way is meant as an indication that Grunau Project Development is not entitled to payment for services rendered in connection with the renovation and remodeling work in an equitable dollar amount.
¶9 This statement, however, was not immediately disclosed to the other parties to this lawsuit. Rather, work continued on the renovation project. In fact, four months after Denny signed the above-referenced statement, subcontractors were induced to sign a Contractor Change Order with Grunau Project, which constituted a compromise agreement where the subcontractor would accept certain "backcharges" assessed against it, in exchange for payment for "extras" it was entitled to receive. When the Contractor Change Order was signed, it was expressly agreed that all terms and conditions of the original contract would remain in full force and effect, including the mutual waivers contained in the contract documents. Brewery Works was aware that such compromise agreements were being entered into between Grunau Project and the subcontractors subsequent to the collapse, and was aware that the mutual waivers of claims were important to the subcontractors.
¶10 On March 19, 2003, Federal and Brewery Works filed suit against Grunau Project, SCS, Arnold & O'Sheridan and Central States.[2] The complaint alleged subrogation claims based in contract and tort, asserting theories of: (1) common law negligence; (2) breach of implied warranty of workmanship and materials; and (3) negligence based on respondeat superior. Substantial discovery was conducted. After discovery was complete, all four defendants filed motions seeking summary judgment. The two main theories supporting the motions were: (1) the primary contract and the A201 contract were enforceable, and therefore any subrogation claims have been waived; and (2) the economic loss doctrine applies. Federal and Brewery Works opposed the motion and submitted an affidavit from Denny, which averred that no written contract existed. Rather, Denny asserted that the work proceeded pursuant to an oral contract, which did not include a waiver of subrogation rights. The affidavit rejected the understanding of all of the defendants that any mishaps during construction would be covered by Brewery Works' all-risk insurer and that all of the parties agreed to forgo the right of suing each other as indicated in the provisions of the standard industry contract forms.
¶11 The trial court conducted an evidentiary hearing and, at the conclusion of that hearing, ruled in favor of the defendants. The trial court determined that Denny's affidavit submitted in opposition of the motion was a "sham affidavit." See Yahnke v. Carson, 2000 WI 74, ¶21, 236 Wis. 2d 257, 613 N.W.2d 102 (parties cannot avoid summary judgment by concocting affidavits contradicting prior admissions and sworn testimony). It then proceeded to rule that the economic loss doctrine barred all of the plaintiffs' tort claims because the contract was one for a productthat is, a completely renovated building, and that there was no damage to other property under the integrated systems analysis. The trial court also held that:
I am now satisfied that there was a contract here that was adopted by  even though not signed, adopted by Brewery Works through their actions.
I know no other way to put all of the information together, but to conclude that there was such a contract ....
....
And I think that his  all these other actions indicate an unequivocal intention to comply with the terms of the AIA contract, and the references in all the change orders that he signed ....
I have a great deal of difficulty with someone who signed change orders making reference to documents, but then there are no such documents, and he knows there is no such documents. [Denny] is signing them so people can get paid versus his deposition testimony where he says, well, the documents that make up this contract are everything except the AIA contract.
But on top of that, the documents  the change orders themselves make reference to and Mr. Denney made reference to his understanding of  that those were referring to the AIA documents. So now, it's not just what I am making reference to, it's making reference to some documents I know were never signed. But so what, I am getting people paid. I know it's specifically referring to the AIA contract, but I know that wasn't signed, but, so what, I want people to get paid, is more than this Court can accept in terms of an argument that there was no such contract.
And I don't think there is any factual dispute here to any degree of  that's required, even in summary judgment, to support the plaintiff'snotion that there was not an agreement between the parties that contained ... the waiver of subrogation clause, which ... makes it clear enough that Brewery Works was bound by the terms of those agreements with respect to these defendants.
....
Therefore, for those reasons as well as arguments advanced by opposing Counsel, I am granting the motions for summary judgment.
Finally, the trial court ruled that Wisconsin does not recognize a claim for implied warranty of workmanship and product under the circumstances presented here. Shortly after the trial court's ruling, Federal and Brewery Works filed a motion seeking reconsideration of the trial court's decision. The trial court denied that motion. Judgments were entered for each of the four defendants. Federal and Brewery Works now appeal from those judgments.

DISCUSSION

A. Contract Issues.
¶12 Although Federal breaks the contract issues down into three parts: whether an oral contract existed, whether the trial court made an improper assessment with regard to Denny's affidavit, and whether Brewery Works accepted the terms of the unsigned standard industry contracts, we address these issues together as they are all interrelated.
¶13 The standard of review of a motion granting summary judgment is de novo. Green Springs Farms v. Kersten, 136 Wis. 2d 304, 314, 401 N.W.2d 816 (1987). We apply the same standards as the trial court. Id. at 315. Summary judgment is appropriate if the material facts are undisputed or if no reasonable alternative inference can be drawn from undisputed facts, and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). In other words, when there is nothing to try, granting summary judgment is proper.
¶14 We start with the trial court's dismissal of Denny's October 27, 2004 affidavit filed in opposition to the motions for summary judgment. The trial court ruled that statements in the affidavit directly conflicted with earlier statements Denny had made in the statement he gave to the insurance company on November 5, 2001, and in his deposition. Specifically, the Denny affidavit asserted that Brewery Works was not operating pursuant to any written contract, but rather had entered into oral agreements for the construction of the project and those oral agreements did not contain any waiver of subrogation provisions. The trial court found those assertions to be ludicrous. We agree that, pursuant to Yahnke, the trial court correctly struck Denny's affidavit.
¶15 The November 5, 2001 statement Denny signed directly contradicted Denny's subsequent affidavit. In the November statement, Denny claimed that no contract had been formed. In the affidavit, Denny asserted that only "oral contracts" had been formed. In Denny's deposition, he admitted that he intended that the project would be controlled by the standard industry contracts, and he admitted that he considered several written documents to be among the contract documents for this project, including the budgetary forms, and the project manuals. The project manuals included the waiver of a subrogation clause identical to the one contained in the unsigned A111 prime contract.
¶16 Based on these clear contradictions, Denny's evolving versions of the truth and the undisputed other facts in the record, the affidavit was insufficient to create a genuine issue of fact for trial. The trial court did not err in striking it in its entirety. Federal contends that even with the affidavit set aside, there still were sufficient disputed material facts to send the case to a jury as to whether an oral contract existed. We disagree for the reasons that follow.
¶17 In looking at the undisputed facts in this case, there is only one reasonable inferencethat Brewery Works, by its conduct, clearly intended that this project would be governed by the standard industry contracts, particularly the A111 and A207, which sat for weeks unsigned on Denny's desk. The fact that Denny never actually signed this document does not render the contract ineffective or unenforceable. See Ziege Distrib. Co., Inc. v. All Kitchens, Inc., 63 F.3d 609, 612 (7th Cir. 1995).
¶18 Although Federal attempts to avoid the waivers of subrogation by claiming that the contracts between Brewery Works, Grunau Project and T-3 were never formally accepted and executed on behalf of Brewery Works, it is impossible to avoid the conclusion that the parties intended these contracts to govern their relationship and intended to waive subrogation rights. "'It is quite fundamental that parties may become bound by the terms of a contract even though they do not sign it, where their intention to do so is otherwise indicated.'" Chudnow Constr. Corp. v. Commercial Disc. Corp., 48 Wis. 2d 653, 657, 180 N.W.2d 697 (1970) (citation omitted).
¶19 The evidence in the record is overwhelming and undisputed that Brewery Works, through its agent Denny, acted as if the written prime contract existed. Denny admitted that Brewery Works always intended to use the AIA contracts on this project. Brewery Works signed an AIA form contract with Grunau Project for the associated parking structure that included the waiver provision. Brewery Works received a substantially identical AIA form contract for the project at issue in this case. Brewery Works allowed Grunau Project and the subcontractors to proceed with the work under the AIA contract without ever objecting to a single clause, phrase, or word in the contract. Brewery Works authorized Grunau Project to sign contracts with all of the subcontractors which expressly incorporated the mutual waiver of claims provisions from the A111 and incorporated project specifications which contained waiver of claims provisions. Brewery Works signed change orders and approved progress payments on AIA forms that, by Denny's own admission, expressly referred to the AIA written agreement between Brewery Works and Grunau Project. Brewery Works did not object at any time to the waiver of subrogation provision in any of the contracts involved in this case. The subcontractors performed the work on the project pursuant to the project specifications which also contained a mutual subrogation waiver provision. After the collapse occurred, Brewery Works signed documents which, it admits, repeatedly acknowledged the existence of the written AIA contracts and permitted the subcontractors to compromise rights and claims based on the belief that the waiver clause in the AIA contracts and the specifications was enforceable.
¶20 The record demonstrates overwhelming evidence that all of the parties involved were operating under the belief that the project was constructed pursuant to the standard industry forms and contracts. All of the parties involved were acting with full knowledge and expectation that the project would be subject to a waiver of subrogation claims. Brewery Works, in fact, secured the "all-risk" insurance required for there to be a waiver of all subrogation claims and claims between or amongst the parties involved. Brewery Works repeatedly ratified the existence and enforceability of the AIA A111 contract by its actions both before and after the collapse. Its consistent conduct in conformance with the contracts and its expressed intent prior to the collapse binds Brewery Works to the contract terms. See Beers v. Atlas Assur. Co., 215 Wis. 165, 175, 253 N.W. 584 (1934) ("it is what the parties manifest to each other that controls and not an undisclosed secret intent"); Estate of Bydalek v. Metropolitan Life Ins. Co., 220 Wis. 2d 739, 746, 584 N.W.2d 164 (Ct. App. 1998).
¶21 As counsel for SCS expressed to the trial court: "If you continue to perform under a contract, and you allow others to perform under a contract, and you repeatedly affirm the existence of the contract, and allow everyone else to assume it continues in force," a party cannot later escape the terms of the contract simply because it was never signed. Accordingly, we agree with the trial court's analysis on this issue. Brewery Works acted in every way as if the contract existed. Thus, Denny's subsequent, subjective, self-serving statements that he never meant to enter into the AIA contract and that he believed that Brewery Works and Grunau Project were operating only under an oral agreement are irrelevant. In fact, there is evidence in the record that not signing the contract was a common practice of Denny's. William Stone of Grunau Project, who had worked with Denny on numerous projects in the past and had known Denny for nearly two decades, testified in his deposition that Denny often did not sign the contract until financing was in place, but Denny's delay in signing did not affect the legally binding effect of the language in the contract. In other words, the parties agreed to the language in the contract and agreed to be bound by it long before Denny actually signed the document.
¶22 Based on the record presented to this court we conclude, as a matter of law, that Brewery Works entered into a written contract with Grunau Project and T-3. There can be no disputed issue of material fact as to this issue because Brewery Works' expressed intent and its conduct demonstrated beyond dispute that the written contract existed. Accordingly, we affirm the trial court on this issue.

B. Economic Loss Doctrine.
¶23 Federal and Brewery Works also challenge the trial court's ruling that the Economic Loss Doctrine ("ELD") operates to bar any recovery of tort claims in this matter. The appellants contend that the trial court erred in reaching this conclusion because the project involved a contract for services rather than a product and, in the alternative, the exception for damage to "other property" applies. We reject both contentions and affirm the decision of the trial court.
¶24 The ELD has recently been given a great deal of attention by the supreme court in this state. In fact, one of that court's recent pronouncements controls the issue raised here. In Linden v. Cascade Stone Co., Inc., 2005 WI 113, 283 Wis. 2d 606, 699 N.W.2d 189, the supreme court resolved each of the issues the appellants raise in this case.
¶25 The first issue is whether the contract in the instant case was one for services or for a product. The trial court determined that in looking at the totality of the circumstances, Brewery Works had contracted primarily for a producta completely renovated building. The appellants dispute this fact and contend that many of the contracts here were for services. Linden specifically addressed how to resolve the issue of whether a contract is for goods or services when the contracts to build a home involve both. The court concluded that a "totality of the circumstances test, which includes both quantitatively objective and subjective factors, should be applied to determine the predominant purpose" of a mixed contract. Id., ¶18. In applying this test, the court determined that the proper contract to review is the prime contract, rather than the subcontracts. Id., ¶¶12, 17.
¶26 Next, the Linden court held that the predominant purpose test needs to assess whether the mixed contract for products and services is predominantly a sale of a product subject to the ELD or whether it is predominantly a contract for services beyond the reach of the ELD. Id., ¶8. The court assessed a number of factors, including "the language of the contract, the nature of the business of the supplier, the intrinsic worth of the materials, the circumstances of the parties, and the primary objective" of the contract. Id., ¶21 (citations omitted). After applying these factors, the court concluded that the predominant purpose of the Linden contract was to deliver a productnamely a finished home ready for occupancy. Id., ¶25.
¶27 In applying the Linden analysis to the facts in the instant case, we reach the same conclusion: the predominant purpose of the contract between Brewery Works and Grunau Project was for the completion of a finished, tenantable building ready for occupancy. Accordingly, the trial court correctly concluded that the mixed contract here had the predominant purpose of providing a product; thus, the ELD applies and bars Federal and Brewery Works' tort claims.
¶28 We are not persuaded by Federal and Brewery Works' attempts to have this case governed by Insurance Co. of North America v. Cease Electric, Inc.'s, 2004 WI 139, 276 Wis. 2d 361, 688 N.W.2d 462, "bright-line" rule that contracts for services cannot be construed as products. Id., ¶2. Cease Electric does not control here for two reasons. First, Linden is the most recent pronouncement and specifically addresses the application of the ELD to a construction contract. Second, Cease Electric involved a contract that was purely for services, not a mixed contract, which is at issue in the instant case. Thus, Linden controls this case and because the predominant purpose of the contract involved here was for a product, the ELD operates to bar the appellants' tort claims.
¶29 The appellants also contend that even if the ELD applies, this case falls into the "damage to other property" exception to the ELD. They contend that because the existing roof and flooring were damaged as a result of the wall collapse, that property "other" than the product was damaged and therefore they should be able to seek recovery for the costs of those damages. We reject this contention as well. Linden also addressed this very issue, and concluded that the integrated systems limitation applies. The integrated systems limitation provides that the damage-to-other-property exception does not apply to escape the application of the ELD when the "other property" is a component part of the renovated building. Id., ¶29. The basis for the decision was that the "other property" damaged had no independent value or use apart from the function as a component of a house. Id., ¶28.
¶30 Here, the same analysis applies. The appellants contend the existing roof and floor constitutes "other property" that was damaged when the wall collapsed. Based on the integrated systems test, however, we conclude that these items are simply component parts of the building. They did not have any independent value or use apart from their function as components of the renovated building. Accordingly, damage to the roof and floors did not constitute damage to other property; therefore, the exception to the ELD does not apply on this basis.

C. Implied Warranty of Workmanship.
¶31 The appellants' final argument is that the trial court erred in dismissing their claims that there was a breach of the implied warranty of workmanship. The trial court dismissed these claims on the basis that no cause of action of this sort existed in the state of Wisconsin. We agree with the trial court's analysis.
¶32 Wisconsin has not adopted an implied warranty of workmanship in connection with a commercial construction contract. Although WIS. STAT. § 706.10(7) implies a covenant of good workmanship and fitness for occupancy in conveyances of real property where the grantor agrees to improve the premises for a specific use, that section applies only between the grantor and the grantee. It does not apply as between the owner of the property and the contractor hired to improve it. Accordingly, we also affirm the trial court's determination on this issue.
By the Court.  Judgments affirmed.
NOTES
[1] There was also a sister contract dated April 1, 2001, which dealt with the parking lot for the bottling house. This contract also contained a similar waiver of subrogation clause and that project was completed without incident.
[2] An amended complaint was filed on April 5, 2004.